STATE OF IOWA, Appellee, v. ANNA KILDUFF, Appellant.

Appeal: ASSIGNMENT OF ERROR: BILL OF EXCEPTIONS. Misconduct in argument will not be reviewed on appeal unless the alleged erroneous matter is presented by a proper bill of exceptions.

**Same:** BILL OF EXCEPTIONS SIGNED BY ATTORNEYS. A bill of exceptions signed and sworn to by the attorneys for one of the parties, after a refusal by the court to sign the same, is not in compliance with the statute applicable to such case, and will not be considered.

**Evidence:** MENTAL CAPACITY. While a non-expert witness cannot testify to the insanity of a person before he has detailed the particular facts upon which he bases his conclusion, this rule does not apply where he is called to testify to the sanity of a person at a particular time; and where he has known the party inquired about for some time and never knew anything unusual in his speech or actions, he may state as his conclusion that the party was sane, without giving any special reasons therefor.

**Same:** REBUTTAL EVIDENCE. Where the defense in a criminal prosecution offered evidence of the insanity of defendant, the state was entitled to prove sanity covering practically the same time as the evidence for the defendant, though not confined to the time of defendant's criminal act.

**Criminal law:** CONFESSION: ADMISSIBILITY. The written confession of a crime, showing upon its face that it was made without threats or promises of any kind, supplemented by the testimony of those present that it was freely made, is admissible over the objection that the same was not voluntary.

**Same:** MURDER: SELF-DEFENSE: INSTRUCTIONS. Where the defendant, armed with a deadly weapon, sought for deceased who was unarmed and trying to escape, and shot and killed him, and there was no evidence that the act was done in self-defense, refusal to instruct on that subject was not erroneous.

*Appeal from Scott District Court.*—HON. A. J. HOUSE, Judge.

FRIDAY, JUNE 6, 1913.

DEFENDANT indicted for murder in the first degree. Trial to a jury. Defendant convicted of manslaughter. Defendant appeals.—*Affirmed.*

*W. M. Chamberlain* and *R. C. Williamson,* for appellant.

*George Cosson,* Attorney-General, and *John Fletcher,* Assistant Attorney-General, for the State.

GAYNOR, J.—On the 24th day of November, 1911, the grand jury of Scott county returned an indictment against the defendant, charging her with the crime of murder in the first degree. Defendant being arraigned and a plea of not guilty having been entered, the cause was tried to a jury, and the defendant found guilty of manslaughter. Motion for a new trial was made and overruled, and judgment was entered upon the verdict. From this judgment, the defendant appealed to this court.

Defendant assigns as error:

First. That the county attorney in his closing argument to the jury, was guilty of misconduct.

Second. The court erred in not sustaining defendant's motion for a new trial, based upon the misconduct.

Third. That the court erred in the admission of testimony.

Fourth. That the court erred in instructions given, and in refusing to give instructions asked by the defendant.

The defendant sets out in his printed argument, in substance, what the testimony showed, and this is by the plaintiff's attorney conceded to be practically all the evidence submitted to the jury.

The evidence is that the defendant left the home of her mother, where she was living, on the afternoon of October 30, 1911, the day of the alleged crime, at about 2 o'clock in the afternoon, having a revolver in her possession belonging to her sister; that she came by way of the street car down to the business section of Davenport and was seen at a five and ten cent store and walking about the streets; that about five o'clock she was seen by Ed. Kilduff, brother of the deceased, standing in the doorway near the entrance to the fish market, where deceased was working; that it was raining at this time; that, as Ed. Kilduff came out of the fish market, she stopped him and asked him to tell her husband, the deceased, to come out; that she was told he was not there; that she refused to believe this and said that she would go and

get him if he did not come out. The brother asked her to wait and he would see if he could find her husband. He went inside and came back and told her that her husband had gone away to see the doctor and would not be back that evening; that the defendant then went inside the building where her husband was working and up to a closet where her husband was hiding and demanded several times that he come out; then that he finally came out; that they talked together for some minutes; that her husband then went into another room of the building; that the defendant requested another man employed in the place to have John come out; that her husband came out again and into the room where defendant was, and that a few minutes later a shot was heard, and that shortly thereafter the defendant was seen to come and look into the adjoining room and then step out of sight, repeating this action three or four times; that shortly thereafter the defendant was seen walking away from the building and her husband was found lying dead with a bullet wound in his head, near the left eye, in the room where he and the defendant had been; that the death of deceased was found to have been caused by said wound; that the defendant walked from said building to the police station and there stated, ''Here is my hand bag; my revolver is in there. I shot my husband.''

As bearing upon defendant's mental condition at the time and the causes thereof, the evidence is that the defendant and John Kilduff, the deceased, were married in 1907, when the defendant was about seventeen years of age; that at the time of said marriage the defendant was pregnant by a man named Kuehl, to whom she was engaged to be married, but who was drowned shortly before the marriage was to have taken place; that her husband was informed as to her condition previous to the marriage and stated his willingness to marry her, notwithstanding her condition, and expressed sorrow for her; that said marriage took place July 20, 1907; that a child was born to defendant November 4th following;

that two children were born to the defendant and John Kilduff, one born in the latter part of the year 1908, and the other about a year later; that John Kilduff contributed little, if anything, to the support of his wife and family; that in May, 1911, John Kilduff deserted the defendant and his children and refused to live with them thereafter, or contribute to their support; that the defendant at the time was in a destitute condition and was compelled to rely upon her family to help support her children and herself; that about the time her husband left her she was told that her husband was associating with other women; that at about this time she had seen her husband in company with a colored woman and stated that she had been informed that he was keeping company with a colored woman and having a regular honeymoon with her at a hotel; that during the summer and fall of 1912 the defendant was nervous and despondent and unable to work regularly, and several times threatened to kill herself, and at other times she was unusually and unaccountably cheerful, and then again she would cry for no apparent reason and sit with her head in her hands, and refuse to answer when spoken to; that she met her husband on several occasions after he left her, at which times he suggested that he would live with her and take care of her only upon condition that she would assist him in conducting a house of ill fame; that, at the time of her marriage, the defendant was strong and healthy, but that in the summer and fall of 1912 she became so pale and reduced in weight that a neighbor of hers at the time of her marriage failed to recognize her at the later period.

The evidence further shows that the defendant as a child was able to make little progress at school; that her father committed suicide while insane; that she has a brother who is weak-minded, and has been an inmate of the State Institution at Glenwood; that upon the date of her arrest for the killing of her husband her conduct and appearance was such

that she impressed the police matron, Mrs. G. W. Hill, who had her in charge, as being weak-minded; that between the time of her arrest and the time of trial the defendant manifested little, if any, interest in, or realization of, proceedings taken concerning her.

The first assignment of error is that the county attorney was guilty of misconduct in his ·closing address to the jury; and the second error is that the court erred in not

1. APPEAL: assignment of error: bill of exceptions.

sustaining defendant's motion for a new trial on that ground. These questions we cannot consider for the reason that they are not properly presented to this court, on bill of exceptions, as required by section 5418 of the Code of 1897.

It appears that the bill relied upon as constituting a bill of exceptions, as set out in the abstract, was not signed or certified to by the judge of the court. It appears that it

2. SAME: bill of exceptions signed by attorneys.

was presented to the judge on May 6, 1912, and refused; that thereafter the attorneys for the defendant signed the bill of exceptions so presented to the judge and swore to the same as containing a true bill of exceptions; and that the statements therein were true. It appears also that the statement set out in the bill of exceptions presented to the court, and which he refused to sign, are denied in an affidavit filed by the county attorney.

The statute provides: "Either party may take an exception to any decision or action of the court, in any stage of the proceedings, not required to be and not entered in the record book, and reduced the same to writing, and tender the same to the judge, who shall sign it if true, and if signed it shall be filed with the clerk and become a part of the record of the cause; if the judge refuses to sign it, such refusal must be stated at the end thereof, and it may then be signed by two or more attorneys or officers of the court or disinterested by-standers, and sworn to by them, and filed with the clerk,

and it shall thereupon become a part of the record of the cause.''

As stated before, the bill of exceptions here presented for our consideration was signed by the two attorneys representing the defendant in the cause and in this court. That this is not a sufficient bill of exceptions to enable us to review matters therein complained of, see *Simon v. Weigel*, 10 Iowa, 505, and it might be remarked in passing that, at the time this decision was made, the statute was substantially the same as it is now. In this decision the court said: ''It is quite clear that to permit the attorneys of the party excepting to certify as well as to draw their own bill of exceptions, . . . and thus manufacture a record to suit themselves, would be to establish a privilege liable to very great abuse, to say the least, and therefore could not have been within the contemplation of the law.''

In the above case, the attorneys for the parties taking exceptions certified to the same after the judge refused to do so. See, also, *St. John v. Wallace*, 25 Iowa, 21, wherein the same doctrine is affirmed, in which it is said: ''As we read and understand the record, one of the persons signing the exceptions was defendant's attorney on the trial, and, upon the authority of *Simon v. Weigel*, this is not allowable. In that case we refused to permit a bill so signed to be made a part of the record. It would follow, of course, that, though sent up, it should be rejected.''

It is next contended that the court erred in admitting certain testimony bearing upon the question of the sanity of the defendant at the time of the commission of the act in question, and it is said in argument that the opinion of a witness on the matter of insanity is not admissible unless all the facts upon which the opinion is based are testified to and the opinion is limited to the facts upon which the opinion is based, as stated to the jury.

When a witness is called to testify, as a non-expert, that a certain person, at a certain time, was insane, before he

is competent to express an opinion as to the insanity of the person, he must state to the court, first, all the facts upon which he bases an opinion, so that the court and the jury may know what it was that he observed that justified the opinion that the person was insane, but this rule does not obtain where a person is called to testify and does testify that a person, at a particular time, was sane. But it is argued by counsel that the same rule should apply to either case, but this is illogical, for the reason that sanity is the rule; insanity the exception; and where it appears that a witness has known a person for a long time and has never known anything unusual, either in his speech or in his actions, he is competent to express an opinion that he is sane, because sane and normal acts and speech are consistent with normal conditions, are consistent with sanity. Insanity, however, not being a normal condition, before one is competent to say that another is insane, he is required to state the facts that he has observed which are inconsistent with sanity. Insanity always manifests itself in some way. It is not a normal condition. Sanity is a normal condition, and, where one conducts himself in such a way as not to distinguish himself from others in respect to the same matters, we pass him by as normal, or sane, but, where he does not, we at once say he is peculiar; he is eccentric; he is not normal; he is different; and we may say, under certain circumstances, that he is insane. A nonexpert testifying to insanity, before he is permitted to express an opinion on that point, must be able to say something that the man has said or done which fairly tends to show insanity. The testimony of the witnesses on the question of sanity or insanity is not, of course, conclusive, but is competent. There was no error, therefore, in permitting these witnesses to testify that the defendant was sane at the time they knew her and observed her, without stating upon what they based their conclusion of sanity.

*3. EVIDENCE: mental capacity.*

The questions propounded to these witnesses to which complaint is made first show when, where, and how long they had known the defendant, and what opportunity they had for observing her. They were not required to state what they observed. Then the question was asked, "Basing your opinion upon what you have testified to, what is your opinion as to the sanity of the defendant at these times?" They answered, "I thought she was sane;" or some of the witnesses answered, "All right, as far as I observed;" and some said, "She seemed sane."

Mrs. Zimmerman and Gus Zimmerman, both called to testify as to the sanity of the defendant, said they lived next door neighbor to her for six or seven years. Lived about two hundred feet from her, and had occasion to see and speak to her. He said she was sane. She said, "I think she was sane."

The questions complained of and the answers are practically all the same. Applying the rule above stated, we find no error in the court's action.

It is further contended that the question as to her sanity was not confined to the time of the act complained of; that many of these witnesses had not seen her for some time prior to the tragedy; but it must be remembered that this testimony was offered in rebuttal of testimony offered by the defendant, which covered practically the same time testified to by the witnesses for the state, and therefore was a rebuttal of their testimony. In support of the above, see *State v. Hayden,* 131 Iowa, 1; *Hull v. Hull,* 117 Iowa, 745; *Stutsman v. Sharpless,* 125 Iowa, 335.

4. SAME: rebuttal evidence.

It is next contended that the court erred in the admission of a written confession made by the defendant on the night the crime was committed on the ground, as complained by the defendant, that the confession was not voluntarily made. The confession was made to the county attorney, in the presence of the sheriff and other officers, after her arrest, and it was after-

5 CRIMINAL LAW: confession: admissibility.

wards written out by the county attorney, read to her, and signed by, her. The statement itself, as signed, shows that it was made freely and voluntarily by her, without threats being used, or promises being made to her, of any kind. The testimony of the officers present supports this statement. The admissibility of this confession is ruled by the case of *State v. Westcott,* 130 Iowa, 1; *State v. Penney,* 113 Iowa, 691; *State v. Storms,* 113 Iowa, 385; *State v. Peterson,* 110 Iowa, 647; *State v. Jordan,* 87 Iowa, 86; *State v. Fortner,* 43 Iowa, 494; *State v. Ostrander,* 18 Iowa, 435. We find no error in the admission of this confession.

It is next argued that the court erred in refusing instructions asked by the defendant. All these instructions asked relate to the question of self-defense, and there was no error in the refusal to submit them to the jury, as there was no evidence before the court, or the jury, upon which the jury could, in any way, find that the act of the defendant in shooting her husband was done in defense of her own person from death or great bodily injury, or that she, as a reasonable person, had reason to apprehend injury to her person at the time of the act complained of. It appears that she voluntarily sought for him on the day of the shooting; that she was armed with a deadly weapon; that he was unarmed; that he sought to escape her. It is next argued that the court erred in giving certain instructions to the jury. Without setting these instructions out, we are of the unanimous opinion that they fairly and correctly state the law applicable to this case, and that there was no error committed by the court therein. There are other questions argued by counsel which are either covered by what has been heretofore said or are not deemed of sufficient importance to require special treatment.

6. SAME: murder: self-defense: instructions.

On the whole record, we find no error and that the verdict is fully sustained by the evidence, and the case is therefore, *Affirmed.*