STATE OF IOWA, Appellee, v. ALFRED THOMAS, Appellant.

**HOMICIDE: Manslaughter—Provocation—Adultery of Spouse.** The
1   law denies recognition to adultery as affording provocation sufficient to reduce a homicide to manslaughter, unless the act of adultery was committed *in the presence and sight* (or the equivalent thereof) of the spouse committing the homicide; and, if in the presence and sight of such spouse, if sufficient cooling time has intervened, a subsequent killing because of such adultery will be murder. Deliberate homicide upon a principle of revenge is always murder.

>    PRINCIPLE APPLIED: A husband and wife separated, she going to the house where deceased lived. Two acts of adultery occurred between the wife and deceased, one a month, and the last one a week, prior to the killing of deceased. The wife was also guilty of other adulterous acts with other men, at which acts the deceased connived. The last of these acts was two weeks prior to the killing. The accused was *informed* of the acts and conduct of the wife and deceased. A week after the said last act with deceased, the accused went to the house where deceased lived, to get his wife and children. He was resisted, and killed deceased. *Held,* for both reasons given in the syllabus, that he could not claim justification *on account of the adultery.*

**HOMICIDE: Evidence—Weight and Sufficiency—Self-Defense.** Evi-
2   dence reviewed, and held to present a question for the jury on the question of self-defense.

**HOMICIDE: Self-Defense—Instructions—Sufficiency.** The rights of
3   the accused were fully protected by instructions, in substance,
(a) that one in defense of his person may use such means as he
deems reasonably necessary in view of all the conditions that
confront him; (b) that it is not necessary that the danger to him-
self be either actual or imminent, if it appears to him acting as a
reasonably courageous man, actual and imminent; (c) that if he
acts in good faith, upon the appearance, and does no more in
defending his person than a reasonably courageous man would
do under like conditions, the law will excuse his acts; (d) that in
exercising self-defense under such circumstances, he is not re-
quired to make nice calculations as to how much force he may
use; (e) that the burden of proof was on the state to negative
beyond a reasonable doubt that the killing was done in self-
defense.

**CRIMINAL LAW: Evidence—Insanity—Opinion—Nonexpert—De-**
4   **tail of Facts.** A nonexpert is wholly incompetent to express an
opinion that a person is insane until he has first detailed what
he has observed about the person that *suggested insanity* or was
*inconsistent with sanity.*

    PRINCIPLE APPLIED: The nearest approach to a detail,
by any witness, of abnormal conditions was this: ''When he
and his wife separated and she was living with the Ashleys,
have you noted any difference in the change of his mind? A. Well,
I would talk to him and he would just go away. He would turn
around, and he just looked odd. He would say something to me
and his stepfather, say something to him or any of us, and he
would just look at us so foolish, and then would turn right around
and would sit down and would cry. We would ask him the time,
or anything, and he would just cry. Cried all the time. Just
acted queer. He would go to bed, fix his bed. He would lay on
the floor, fix it just like a dog's nest, and cry all the time. Just
worry and cry and act so funny.'' *Held,* wholly insufficient to
raise an issue of insanity.

*Appeal from Polk District Court.*—HON. CHARLES DUDLEY,
Judge.

WEDNESDAY, NOVEMBER 17, 1915.

DEFENDANT was convicted of murder in the second degree.
From judgment on this conviction, he appeals.—*Affirmed.*

*H. W. Laton,* for appellant.

*George Cosson,* Attorney General, for appellee.

GAYNOR, J.—It appears that, on the 8th day of August, 1914, the defendant shot and killed one James William Ashley. The instrument used in the killing was a 32-caliber revolver. Two shots were fired, only one of which was fatal. The first shot entered and passed through the left ear of the deceased. The other went through the body, entering about the right border of the left shoulder blade and extending through the body to the left side of the heart. The opening or entrance of the bullet was in the back and slightly to the right of the left shoulder blade. This was the wound that caused his death. The bullet came out of the left side of the heart. Deceased lived for a few hours thereafter. The fact of the killing is not in dispute. It occurred in the home of the deceased. Deceased was a man sixty-six years old. Defendant was thirty-six. Deceased was, at the time, making his home with his son, H. A. Ashley. This son was married and had several children. Defendant's wife was a sister of Mrs. H. A. Ashley's and, at the time of the shooting, was staying with her in the Ashley home. Prior to this shooting, Mrs. Thomas had separated from her husband and, at the time, had been staying with the Ashleys about three months. The shooting occurred about the middle of the day. Upon the trial of this case, the defendant was convicted of murder in the second degree. From this he appeals.

Counsel, in presenting this case to this court, does not point out any definite and distinct error committed by the trial court upon which he relies for reversal; but, from an examination of the case as presented, we gather the thought that it is the contention of the defendant: first, that the evidence considered as a whole does not justify a conviction of the defendant of any offense; second, that the court erred in its instructions to the jury.

In presenting this case to the court, the defendant has not seen fit to set out all the instructions given by the court to the jury. Certain instructions have been singled out, which, the defendant claims, in and of themselves, separately considered,

do not correctly express the law by which the jury should be guided in determining the ultimate fact of guilt upon the issues tendered. While the plea entered by the defendant was a general plea of not guilty, the defendant claims,—and we think, perhaps, in this claim he is justified,—that, in the plea of not guilty, were tendered the following defenses: (1) Justifiable homicide; (2) self-defense; (3) insanity; and (4), that in no event should the conviction have been of a higher degree than manslaughter.

This case was before this court on a former appeal. See *State v. Thomas,* 169 Iowa 591. On that appeal, the record disclosed that certain evidence was offered by the defendant and rejected by the court. This was held error, and, upon that ground, the case was reversed. The evidence rejected on the former trial was admitted on this trial. This evidence tended to show that, while the defendant's wife was residing in the Ashley home, the deceased had sustained improper and unlawful commerce with the wife, and had forced her to submit to others. Evidence tending to establish that fact was submitted on this trial, though not of a character to impress the mind very strongly with its truth. There was further evidence tending to show that, prior to the killing, this fact was communicated to the defendant. The evidence disclosing improper relations between the deceased and the defendant's wife was given by the wife, and is to the effect that she and her husband separated in the spring of 1914; that she went to live with the Ashleys about the 27th day of May and continued to live there until some time in September; that, about a week prior to August 8th, the deceased had improper intercourse with her; that he had this once before, about a month prior to the killing. She testified further that several men had intercourse with her during the time she stayed with the Ashleys; that this occurred three times, the first time about two months before, the second time about one month before, and the last time about two weeks before the killing. She

claims not to know any of these men or to be able to describe them.

The defendant testified as follows:

Q. "Do you know of any reports being made to you about any misconduct or illicit intercourse taking place between the deceased and your wife during the time she was there?" A. "Yes, sir; I cannot tell how many times it came to me." Q. "Can you name any of the parties that made the report to you?" A. "Yes, sir." Q. "Tell the jury the names if you can remember." A. "F. D. Ashley, the son of the deceased. The last time this report came to me it was on the 8th of August, the day of the trouble. It had been reported to me that this old man Ashley and Alex were keeping my wife there for immoral purposes and prostitution prior to that date. J. F. Ashley told me that he had seen the deceased with his arm around my wife; that he was making love to her. He told me this on several occasions."

Defendant further testified that, on the day of the killing, reports came to him that the Ashleys were keeping his wife for immoral purposes.

The record discloses that, on this 8th day of August, the defendant came from the home of his stepfather, situated about three miles distant, to the home of the deceased. He claims that he came for the purpose of getting his children, who were at the Ashleys with the wife. He testifies that, when he reached the deceased's home and the deceased discovered him there, the deceased commenced "cussing" him; that he said to the deceased, "You sent word for me to come and get my children. I have come here for no trouble whatever." Thereupon, they ordered the wife into the house. She went into the house, and the daughter-in-law handed the deceased a sword; and the deceased said, "I am going to kill you," applying an opprobrious name; and the deceased then struck him with the sword and cut his pants. He jumped back, pulled his gun and shot, the bullet passing through the ear of de-

ceased. The next time, the deceased struck with a swinging stroke. Defendant jumped again and shot. He did not know whether he hit the deceased or not, but he immediately left. Deceased died about three hours thereafter. This presents the defendant's side of the case, and upon this, he predicates justifiable homicide and self-defense.

The defendant first contends that, inasmuch as the evidence shows that the deceased was retaining his wife there for immoral purposes, this fact being brought home to him, he had a right to go to deceased's premises, demand his wife and children, and, if his demand was resisted, he had a right to overcome the resistance, even to the extent of taking the life of the deceased.

1. HOMICIDE: manslaughter: provocation: adultery of spouse.

This proposition was considered on the first appeal. In that case, it was said: "The law is well settled that, if a man discovers another in the act of ravishing or attempting to ravish his wife and he kills him, he is justified therein as fully as the wife herself would have been had she killed him."

The law herein expressed rests upon the thought that a husband has the same right to defend his wife against a wrong committed in his presence as the wife would have to defend herself; however, the same rule must apply to his conduct as would apply to the conduct of the wife, if she had invoked the rule of self-defense. A wife may defend herself against the assaults of a ravisher, even to the taking of life, if such appears to her reasonably necessary to be done, in order to protect herself from such assault. The further rule applies that, in order to justify her act in taking life, it must appear to her at the time, acting as a reasonably prudent person, that the taking of life was necessary to protect herself from such assault. A different rule, however, obtains where the husband discovers the wife in the act of adultery, an act consented to by her. There she would have no right to take the life of her paramour because of the act committed, and the husband, in her stead and in her defense, would have no greater right than she had in the

premises. The distinction is clearly pointed out in the quotation from Bishop (2 Bish. Crim. L. Sec. 708), appearing in the first opinion filed in this case, in which it is said: "If a husband finds his wife committing adultery, and, provoked by the wrong, instantly takes her life or the adulterer's, . . . the homicide is only manslaughter." That is, the act in taking life under such circumstances is not wholly justified by conditions existing, but may extenuate the offense and reduce it to manslaughter. The quotation further proceeds: "But, if, on merely hearing of the outrage, he pursues and kills the offender, he commits murder. The distinction rests on the greater tendency of seeing the passing fact, than of hearing of it when accomplished, to stir the passions; and if a husband is not actually witnessing the wife's adultery, but knows it is transpiring, and in an overpowering passion, no time for cooling having elapsed, he kills the wrongdoer, the offense is reduced to manslaughter."

It is said in that opinion, in substance, that there is a clear distinction between the criminality of the act, where the husband kills a ravisher found in the act of ravishing, and where he kills one found in the act of committing adultery with his wife. The first offense is committed by force, unlawful and wicked, and force may be resorted to for protection, either by the ravished wife or her husband: by the husband on discovering the act in progress. The force applied by either may be such as appears reasonably necessary to overcome the assault, and to protect the life or honor of the wife, even to the taking of human life. The second offense is not committed by force, but by the consent of both parties. There, the husband would have no right, upon a mere discovery of the attitude of the wife and her paramour, to take the life of either; but if it appears that he came upon them suddenly and it provoked him to wrath and caused his power of control to escape its bounds and the killing ensued, these facts may reduce the killing to manslaughter. However, in either case, if sufficient time has elapsed, after the consummated act of ravishment or adultery, so that the blood has time to cool and

reason resume its sway, the law will not permit the injured husband to redress the wrong by taking the law into his own hands and wreaking vengeance upon his wife's paramour; and if he does, he is guilty of murder.

Referring to the opinion filed in the first appeal, we find this quotation (Foster, Crown Law, 296), which aptly expresses the law on this point, and we here reproduce it:

"A husband finding a man in the act of adultery with his wife and in the first transport of passion killeth him; this is not more than manslaughter. But had he killed the adulterer deliberately and upon revenge, after the fact. and sufficient cooling time, it had been undoubtedly murder. For let it be observed that in all possible cases, deliberate homicide upon a principle of revenge is murder."

The record in this case discloses, from defendant's viewpoint, that whatever wrongful intercourse was had between the deceased and the defendant's wife, or by his procurement, had transpired long before this fatal meeting; that, on this particular morning, the defendant came to the home of the deceased for the purpose of regaining possession of his children, and, so far as this record shows, for no other purpose; that he informed deceased at the time that he did not come for trouble; that the deceased used violent language towards him when he first arrived, but desisted from so doing and returned to the house; that he followed the deceased into the house, believing that the trouble was over; that after that, the trouble arose which resulted in the killing.

2. HOMICIDE: evidence: weight and sufficiency: self-defense.

This brings us to the consideration of the second proposition—Does the evidence show such a state of facts as indicates that the killing was done, on the part of the defendant, in defense of his person from death or great bodily harm?

We have heretofore in this opinion set out the plaintiff's contention as to what happened in the house. If that were all, the defendant's theory of the defense would seem to be fairly well established: that, however, is not the theory of the

state as to what actually occurred, as appears from the testimony of the state's witnesses.

Mrs. H. A. Ashley testified in substance that, on the day of the killing, she first saw the defendant in the yard, coming towards the house; that she and her sister, Mrs. Thomas, were sitting in the kitchen; that the first thing said by the defendant, when he came up, was, "Why don't you let the children come out?" and that he stated that Mr. Ashley motioned for them to go back when they started out; that this fact was not true; that defendant then pointed a revolver at the deceased and she and her sister went into the bedroom; that she heard two shots fired after she entered the bedroom; that it was not very long between the first and second shots; that the shots were fired almost instantly; that the deceased came into the house. He said nothing when he came in.

"I got his scabbard and gave it to him. This was after the shots were fired. The saber was hanging in the bedroom. It was in a scabbard. He took out the saber. He was an old soldier. He started out doors with it. It was quite a little bit after I handed him the sword that I went out. I found him laying out in the yard. When I went out, I did not see the defendant. I did not see him again that day. Mrs. Thomas and I went into the bedroom at the same time. We got into the house before we heard any shots."

Charley Ashley, son of Mrs. H. A. Ashley, testified that he was at home the day of the shooting. He first saw the defendant at the door.

"Grandad was inside. Defendant was outside when he shot and Grandad was in the kitchen door. Defendant then went into the house. Grandad went into the middle room and defendant went to the other door and shot Grandad the last time. After he shot the last time he left. I saw Grandad go out after the defendant left. He did not have his sword. He was getting his sword when Alfred started to shoot him the first time. The sword was in the other room. Grandad got the sword after the second shot. Saw mother hand it to him.

Defendant went out of the door about the time Grandad got the sword. I was in the bedroom looking out of the window at the time I heard the first shot."

Mrs. Thomas, called for the defendant, testified:

"The deceased was in the kitchen when the first shot was fired. My husband was just coming through the door of the kitchen when the first shot was fired. I did not see the second shot fired. I just heard it. I was then in the bedroom."

This is practically all the testimony touching what occurred at the time of the shooting. The defendant, however, testified that he had frequently visited this house for the purpose of getting his children, and claims that the deceased and his son would not permit him to see the children. "On one occasion", he says, "the son came out of the house with a pocket knife in one hand and an ax in the other and the old gentleman grabbed up a club. They told me they were going to kill me and struck at me, and I got back off the place. I once in a while would go there to see whether I could see my wife and children."

We are requested to say, upon this showing, that the jury was not justified in finding that the killing was not done in self-defense. This we cannot do. To decide this question was peculiarly the province of the jury. The evidence so abundantly sustains the finding that we must permit it to stand. The law of self-defense has been so frequently announced by this court that further pronouncement would only add to the volume, and not to the weight of the law upon this subject.

The court, in instructing upon this point, so stated the law that the jury could well see and understand the right which the law gave this defendant, to defend himself against the aggressive acts of the deceased, as the same

3. HOMICIDE: self-defense: instructions: sufficiency.

were set forth and developed upon defendant's theory of what actually took place. The purpose of the instructions is to inform the jury of the law which governs the rights of the parties under the peculiar

facts, as they exist in the particular case. It is the jury's only guide as to the legal rights of the parties in the premises. The law was so stated by the court (and should always be so stated), that the jury knew not only what the law is abstractly, but what the law is concretely and in its application to the rights of the parties in the particular case. By this, we do not mean that there should be a law for every. case, but that the law as it is should be so stated in each case that its application to the facts developed in the case could be readily seen and made by the jury. The court, in instructing the jury in this case, told the jury, in substance, that one in defense of his person may use and adopt such means as he deems reasonably necessary, in view of all the conditions that confront him; that it is not necessary that the danger to himself be either actual or imminent, if it appears to him, acting as a reasonably prudent and courageous man, actual or imminent; that if he acts in good faith, upon the appearance and does no more in defending his person than a reasonably prudent and courageous man would do, under the circumstances and conditions that confront him at the time, the law will excuse his act. The court further told the jury that if one is assaulted by another who is armed at the time with a deadly weapon, the person assaulted may resist such assault, even to the taking of the life of his assailant, if to him, acting as a reasonably prudent man, it appears the only course open to him to protect his person from death or great bodily injury. The court further told the jury that the burden rested upon the state to negative, beyond a reasonable doubt, that the killing was done in self-defense. The court said:

"Where a person assaulted, acting as a reasonably prudent and cautious man, believes that his assailant is about to take his life or to inflict upon him great bodily injury, he is not required to make nice calculations and draw nice distinctions as to how much force he may use to shield himself from danger, but he is justified in using such force as an ordinarily prudent

and cautious man, acting upon appearances, would in like situation probably exercise.''

We think that the instructions upon this branch of the case were as full and explicit as the facts of the case called for, and presented the law of self-defense in such a manner that the jury could not be misled into misunderstanding or depreciating the fullness of this legal defense invoked by the defendant. We see no error here.

It is next contended that the court did not fully instruct the jury on the defense of insanity. The defendant's plea was "not guilty". There was no special plea that he was insane at the time of the commission of the crime.

4. CRIMINAL LAW: evidence: opinion: insanity: nonexpert: detail of facts.

At the beginning of this trial, the defendant was presumed to be sane. The presumption is always in favor of sanity, and, until there is some competent evidence which tends to overthrow the presumption of sanity, that presumption continues to the end of the case, and the state is not required in the first place to prove sanity. The defendant attempted to introduce evidence for the purpose of showing that the defendant was insane at the time of the commission of the act, and had been insane for some years prior to that time. No experts were called by the defendant upon this question. Reliance was had upon the opinion of nonexperts. The law is well settled that the opinion of a nonexpert cannot be received to establish insanity, until the witness has shown a knowledge of some fact or circumstance which, in themselves, show that the party whose sanity is in question is not normal. Sanity is the normal condition, and is presumed to exist until the contrary appears. One who has known a person for a long time and has had an opportunity to observe his speech and conduct and has never observed in either anything unusual or out of the ordinary—nothing that distinguished him from other men—is competent to express an opinion that the man is sane. Sane and normal speech are consistent with normal conditions. Insanity, however, is not a normal condition. Before one who is

not an expert is competent to say whether another is insane, the law requires that he state what he observed that was inconsistent with normal conditions or suggested insanity. Insanity always manifests itself in some way. It is not a normal condition. Sanity is a normal condition.

As said in *State v. Kilduff*, 160 Iowa 388, 395, "Where one conducts himself in such a way as not to distinguish himself from others in respect to the same matters, we pass him by as normal or sane, but where he does not, we at once say he is peculiar; he is eccentric; he was not normal; he is different."

A nonexpert testifying to insanity, before he is permitted to express an opinion on the point, must be able to point to something, either in speech or conduct, which tends to show an abnormal condition of the mind.

In the case at bar, none of the witnesses who were called by the defendant to testify stated any fact touching the conduct or speech of the defendant observed by them which tended in any way to indicate that he was in the least abnormal. They were not competent to give an opinion. Witnesses were asked the direct question, without first qualifying themselves to answer, whether they considered the defendant insane or not. One H. W. Laton was called on this question, and said that he had known the defendant ever since he was a boy and observed his conduct. Said that he considered him three fourths lunatic; that he was a person of unsound mind, and the neighbors all considered him so virtually. The witness did not state anything that he had observed that was peculiar about the defendant, either in his speech or actions. The testimony was objected to and objection sustained on the ground that he did not narrate any facts upon which to predicate an opinion or conclusion as to the sanity of the defendant. The court, after ruling, said: "The witness may state facts upon which he predicates his opinion so that the jury may know upon what he predicates his opinion." This the witness refused or neglected to do.

John Hall, stepfather of the defendant, was called as a

witness on this point. He was asked the same question in the same way, thus, "I say, would you consider him of unsound mind or sound mind?" Objected to and sustained by the court on the ground that he had narrated no facts upon which any conclusion as to the sanity or insanity of the defendant could be based.

Samantha Hall, mother of the defendant, was called. This question was propounded to her: "I want to ask you about the mental condition of this defendant during all his life as you remember it. Has he been of sane mind or unsound mind?" There seems to have been no answer to this question, although an objection was interposed and overruled. The question then was asked, "During his entire life, have you noticed anything that would lead you to say that he was of unsound mind?" A. "Yes, sir." Q. "Now you may state to the jury what peculiarities or things you have noticed during his life that would lead you to believe he was of unsound mind." A. "Well, his actions." The question was then asked, "When he and his wife separated and she was living with the Ashleys, have you noted any difference in the change of his mind?" A. "Well, I would talk to him and he would just go away. He would turn around and he just looked odd. He would say something to me and his stepfather, say something to him or any of us, and he would just look at us so foolish, and then would turn right around and would sit down and would cry. We would ask him the time or anything and he would just cry. Cried all the time. Just acted queer. He would go to bed, fix his bed. He would lay on the floor, fix it just like a dog's nest and cry all the time. Just worry and cry and act so funny." She was then asked this question: "Nevertheless in your mind you had an idea that he was not of sound mind?" A. "Yes, sir."

This was all the testimony offered and submitted on the question of defendant's sanity. This evidence was wholly insufficient to raise an issue of insanity, and yet the court instructed the jury that, if they believed that the defendant was

insane or his mind unsound to such an extent that his reason and judgment, with respect to the particular act, were so impaired that he could not comprehend the nature and consequences of his act, and know that it was wrong, he was not guilty in law of the crime charged or any included offense, and the jury should so find. This thought was amplified in the instruction. We find no ground for reversing the case upon this issue.

We have read this record with some care, more painstakingly, probably, than we would have done had the case been more logically and systematically presented in this court. We are satisfied from the record that the verdict of the jury has full support in the evidence; that no prejudicial error was committed by the court; that, if there is not that fullness in the record of which counsel complains, it is due largely, if not entirely, to the manner in which the defense was presented. A little more familiarity with the rules which govern the court and the parties in the introduction of evidence would have enabled counsel, no doubt, to have made the record on his affirmative defenses more intelligible to the jury. The mind of counsel in the trial seems to have been controlled and directed by the thought that, if it could be made to appear in the record that the deceased had had illicit intercourse with the defendant's wife, this would be full justification for the taking of the life of the deceased. Most of counsel's effort in this trial seems to have been expended on that subject. The only evidence of illicit relations is the testimony of defendant's wife, and this testimony is wholly inconsistent with, and a flat contradiction of, the testimony given by her before the grand jury at the time the indictment was found. Therefore, little credence can be given to her testimony. The jury was justified in rejecting it, in so far as it was competent, in extenuation of the offense.

We find no reversible error in the case and the cause is—
*Affirmed.*

DEEMER, C. J., LADD and SALINGER, JJ., concur.