STATE OF IOWA, Appellee, v. ROY MAUPIN, Appellant.

**CRIMINAL LAW:** Argument—**Argument Aside the Record.** The
1   county attorney may, within fair and reasonable limits, respond to an argument which is outside the record.

**CRIMINAL LAW:** Evidence—**Other Offenses—Incidental Showing.**
2   Defendant's account of what took place at the scene of a crime may be admissible even though such account incidentally shows the commission by defendant of a crime other than the crime for which he is on trial.

**CRIMINAL LAW:** Evidence—**Expert Opinion—Detail of Facts.** A de-
3   tail of facts need not precede a nonexpert opinion as to the *sanity* of a person. Otherwise as to *insanity.*

*Appeal from Polk District Court.*—LESTER L. THOMPSON, Judge.

APRIL 3, 1923.

SUPPLEMENTAL OPINION NOVEMBER 13, 1923.

THE defendant was indicted, charged with murder in the first degree, was tried, and was convicted of the crime of murder of Joe Hayes by striking him on the head with a wooden club. The jury fixed the death penalty, and judgment was entered in conformity with the verdict. Defendant appeals.—*Affirmed.*

*Charles P. Howard* and *George H. Woodson,* for appellant.

*Ben J. Gibson,* Attorney-general, *Maxwell A. O'Brien,* As-

sistant Attorney-general, and *Arthur G. Rippey*, County Attorney, for appellee.

ARTHUR, J.—That defendant killed Joe Hayes, there is no doubt. Defendant offered no testimony to in any way contradict the evidence offered by the State of what occurred at the scene of the murder on the night of January 20, 1922. Also, defendant made a confession of the commission of the crime, in which he related the facts of the crime substantially as shown by the other testimony offered by the State. It is permissible, under the record, to make a statement of the salient facts of the crime, as follows:

The scene of the crime was at Carney, where the Saylor mines are located, about 8 miles north of the city of Des Moines, in Polk County, Iowa. There are about 80 small houses for miners to live in, in Carney. Hayes's occupation was check-weighman at the mines, and he was employed and paid by the miners' union. He lived at the mining camp, and had a wife and four children. The killing occurred on the night of January 20, 1922. Defendant and Hayes both belonged to the local miners' union. The local union had a meeting in the evening of January 20th in the Union hall at the camp, and Hayes and the defendant were both present at the meeting. During the meeting, George Fletcher, who was treasurer of the local union, paid Hayes for his services as check-weighman, by giving Hayes an envelope containing $80.92, the money consisting of three $20 bills, two $10 bills, a 50-cent piece, a quarter, a dime, a nickel, and two pennies; and Hayes signed a voucher receipting for the payment of the money. The payment of money was made by Fletcher to Hayes on the platform in the hall, and defendant saw the transaction. Hayes opened the envelope that was handed to him by Fletcher and counted the money, at the time he received it, and replaced the money in the envelope, and put the envelope in his pocket. After the meeting, Hayes left the hall in company with Fred Brown, Joe Tollari, and Wesley Dinrell, and started to his home. Defendant followed Hayes down the stairs from the Union hall.

Defendant is a negro. At the time of the trial, he was about 24 years old. He was born in Missouri, and moved to Iowa about

10 or 11 years ago, and started to work at what was then known as Saylor Mine No. 3, at Carney. He performed work there, doing what was called "trapping" in the mine, greased machinery, dug coal, and worked as a mule driver. He enlisted in the army of the World War, and served about two years in a labor battalion, and was honorably discharged in July, 1919. On his return from the army, he stayed with his parents at their home at the Carney mines, and in a few days secured work in Saylor Mine No. 2, as a mule driver. He was married in January, 1920. He followed his employment steadily until January 6, 1922, when he received a minor injury to his finger, and lay off from his work. His work consisted of driving a mule, hitched to a small car, through the entrance of the mine from various rooms where coal was being dug in the mine. There are about 80 houses in Carney,—small houses, for miners to live in,—and these houses were numbered. The defendant at that time was living in House No. 54. His mother-in-law lived in Carney, in House No. 34. These two houses were on the same street. Defendant was not working on January 20, 1922, the day Hayes was killed, and had not been working since January 6th, on account of the injury to his finger. On January 20th, defendant had supper at his home about 5 o'clock, and after supper went to the pool hall, which is in the same building where the union meeting was held which was attended by defendant and Hayes and others, on the night of January 20th; and his wife went over to her mother's, who lived in Cottage No. 34. Later, the defendant attended the meeting of the local union in the hall, and after the meeting was over, followed Hayes downstairs from the Union hall, and went to his home, then down by the mine shaft. At the mine shaft, what are called "paddles" were kept. These are heavy wooden paddles, used to hold the cage lock back, so that a mine car can be taken off the cage. One of these paddles or clubs was found, bloodstained, near the spot where Hayes was struck down. There was a light snow, and the ground showed the marks in the snow where Hayes had been assaulted, the snow being bloodstained, and the footprints showing plainly at this spot. The defendant, after getting the club, went to the home of Hayes, and at a spot about 35 or 40 feet from the back door of the Hayes cottage waited for Hayes,

standing beside a clothesline pole. Hayes parted from his companions, who had left the hall with him, before reaching his home, and when he reached the clothesline pole in his back yard, the defendant struck him over the head, felling him to the ground, and then robbed him of the envelope containing the money he had received at the Union hall. This occurred a little after 9 o'clock, the evening of January 20, 1922. Mrs. Hayes heard a noise at her back door, and when she opened the door, her husband fell into her arms, and she called in some of the neighbors. Hayes never regained consciousness, and died about two days later, from cerebral hemorrhage, resulting from the wound on his head, which caused a fracture of the skull. After striking Hayes down and taking the envelope containing the $80.92 from his pocket, defendant fled from the scene of the crime to the house of his mother-in-law, and after remaining there a short time, returned, with his wife, who was at her mother's, to his home.

Defendant did not testify in his own behalf. Besides his plea of not guilty, he entered a special plea of insanity.

Defendant assigns errors on which he relies for reversal, which we will consider and pass upon.

I. Defendant moved to quash the indictment, on the ground that the grand jury which found the indictment against defendant "was not lawfully listed, and was unlawfully drawn and unlawfully impaneled," and therefore had no lawful authority to return the indictment. In the same motion, defendant also moved for his discharge on the ground that the panel of the trial jury from which a jury was afterwards selected in the defendant's case "was unlawfully listed and drawn." Said motion or motions were overruled, and plaintiff assigns as error such ruling. We have gone to the transcript of the case and examined it, and it does not disclose any showing whatever of the matters complained of. The record is entirely silent respecting the manner of obtaining the list of grand jurors and trial jurors, and respecting the drawing and impaneling of the grand jury and also, afterwards, the drawing and impaneling of the trial jury. No evidence was offered, touching these matters complained of in defendant's argument. Under this situation, we cannot consider this assignment further than to say that it will

be presumed on this appeal, nothing appearing to the contrary, that the jury lists were properly made, and that the grand jury and trial jury were properly drawn and impaneled.

After the trial jury had been impaneled and sworn, defendant moved for a continuance of the case for the reason that he had not had sufficient time and opportunity to prepare for trial; and that Charles P. Howard, attorney, who had been appointed by the court to defend him, had not had time, on account of other business, to prepare for trial of this case; also, that George H. Woodson, his attorney, was in poor health, and unable, on that account, to make a proper defense for him. The motion was overruled, which defendant assigns as error.

We think that the assignment is without merit. We have said, in substance, so often that authorities need not be cited in support thereof, that an application for continuance is addressed peculiarly to the sound discretion of the trial court, and that its ruling thereon will not be interfered with on appeal unless it clearly appears that the trial court has abused his discretion, and that an injustice has resulted therefrom. Attorney Woodson, as shown by affidavits, was not in good health, and doubtless the trial of the case was severe on him for that reason. However, it is evident from the record that the defendant did not suffer on account thereof. Defendant was given an able defense. We think that the court did not abuse his discretion in overruling the motion.

II. Defendant complains of misconduct of the county attorney in closing argument to the jury. We have examined the record carefully with respect to this assignment, and find that 1. CRIMINAL LAW: argument: argument aside the record. the argument complained of was fairly responsive to the argument made by counsel for defendant. Counsel for defendant, in addressing the jury, went somewhat wide of the record, and the county attorney only countered to such argument. Both arguments were within the hearing of the trial court, and we think that the court did not err in refusing a new trial on such ground.

III. Defendant complains that the court erred in admitting in evidence the written confession of defendant, without allowing defendant's counsel opportunity to first examine the witnesses who were present when the confession was made, as to

the circumstances under which the confession was made. We have examined the transcript with reference to this complaint, and find that it is without merit. The record does not disclose that defendant's counsel requested the privilege of first examining the witnesses with a view to ascertaining the circumstances under which the confession was made. The record shows, without question, that the confession was made eligible for the record before it was received. Also, counsel for defendant cross-examined the witnesses exhaustively.

IV. Appellant complains that error was committed in receiving evidence concerning commission of another crime committed by him, in admitting the testimony of witness W. E.

**2. CRIMINAL LAW: evidence: other offenses: incidental showing.** Robb, wherein Robb testified that defendant told him that he and another man had robbed a store. The record discloses that the testimony complained of was a part of the conversation between the defendant and the officers in the sheriff's office, wherein the defendant was implicating another man in the killing of Joe Hayes, and was a part of his story concerning this other man, and how he came to be acquainted with him. It was all a part of the same conversation and transaction wherein the defendant eventually confessed his guilt of murdering Joe Hayes. We have repeatedly held, in substance and effect, that all of what the accused had to say, at the time and place, about the commission of the crime with which he is charged, is admissible, even though incidentally the conversation may show that the accused had committed another offense. This assignment is without merit. *State v. O'Connell,* 144 Iowa 559; *State v. Wallack,* 193 Iowa 941.

V. Error is assigned because nonexpert witnesses in behalf of the State in rebuttal were allowed to testify that, in their opinion, defendant was sane, without any testimony by the

**3. CRIMINAL LAW: evidence: expert opinion: detail of facts.** witnesses as to facts upon which their opinions could properly have been based. Evidently counsel have not understood the rule in this state relative to the admission of testimony of nonexpert witnesses as to the sanity of a person. We have held that a nonexpert witness may testify and give his opinion that a person was sane at a certain time, without first giving facts upon which to base such an opinion, although a nonexpert is incompetent

to express an opinion that a person is insane, until he has first detailed sufficient facts of conduct on which to base an opinion. *State v. Kilduff*, 160 Iowa 388; *State v. Thomas*, 172 Iowa 485.

VI.  Error is assigned on the ruling of the court in excluding the testimony of defendant's mother, Mrs. Minnie Maupin, to show that her aunt on her mother's side was insane, and the testimony of defendant's father, Lee Maupin, that his mother and his grandmother were insane.  Examination of Mrs. Minnie Maupin, mother of defendant, by counsel for defendant follows:

"Q.  I am calling your attention to the question of insanity in your family, and I want you to tell the jury what is the fact as to any sort of insanity in your family, if you know of any.  (Over objection of counsel for the State, the witness was allowed to answer.)  A.  I had an aunt,—she used to have fits. Q.  What, if anything, was her condition when she died, as to being sane or insane, if you know?  A.  I don't know certainly; I heard the older people say she was not—didn't have a clear mind.  (On motion of the State's attorney, the answers were stricken.)  Q.  Tell the jury which side of the family was this aunt on.  A.  My mother's side.  She was my grandmother's daughter.  Q.  What was her condition when she died, as to whether she was sane or insane?  (Objection to the question was sustained.)  Q.  Did you know this aunt?  A.  Yes, sir. Q.  Do you remember seeing her condition?  A.  Yes, sir.  They sent her to school.  Q.  Do you remember of seeing her condition?  A.  Yes, sir.  Q.  Can you tell the jury, from what you saw of this aunt and of your personal connection with this aunt, are you able to tell the jury whether this aunt was sane or insane?  (Objection to the question was sustained.)"

Lee Maupin, father of defendant, testified, on examination by defendant's counsel.  Asked if there had been insanity in his family, witness answered, over objection of counsel for the State:

"Well, my mother was.  Q.  Anybody else?  A.  Grandmother."

On objection by the State's attorney that the testimony was incompetent, irrelevant, immaterial, and not the best evidence, and called for a conclusion and opinion and hearsay testimony;

that there is no showing that the type of insanity, if there were any insanity, is the same type of insanity, if there is any, that exists in the case of the prisoner at bar; and that the witness is not competent to testify on this subject, the testimony of the witness as to the insanity of his mother and grandmother was stricken. Witness stated that his mother had been dead about nine years.

"Q. What was her physical condition or mental condition at the time of her death, if you know, as being of sound or unsound mind?"

Over objection by the State, the witness answered: "She did not have any mind at that time." The answer was stricken on motion by the State.

"Q. Now tell the jury anything peculiar you noticed about her condition in her last sickness."

Witness was permitted to answer, over objection by the State, that she was able to go about, the day before she died; she was not able to go out of the house unless someone was with her, and she had to be cared for. "Her mind was not good." On motion by the State, the portion of her answer "her mind was not good" was stricken.

During the examination of the witnesses, the trial court announced to counsel his attitude with respect to the evidence offered; that the testimony offered would be received, provided the proper foundation were laid for its admission; that any material, competent evidence would be received, on the part of defendant, to establish hereditary insanity of the defendant; and that members of the family might testify to family history consisting of facts, but not to conclusions not based on facts.

We have fully set out the testimony offered, bearing on this assignment. We are not called upon to say in this case whether or not competent evidence of insanity in defendant's family should have been received. None was offered. We have held that, before a witness may give his opinion that a person is insane, he must qualify by detailing fully the facts upon which his opinion is based. *State v. Thomas*, supra. In attempting to introduce the above mentioned testimony of insanity of defendant's ancestors, counsel for defendant failed to lay any proper foundation for the admission of such testimony, if it were com-

petent, to show insanity in the family. Merely asking a witness whether the witness's aunt, grandmother, or great-grandmother was insane, without qualifying the witness, rendered the offered testimony clearly inadmissible. Neither of these witnesses attempted to testify to facts upon which to base an opinion. The record shows that several times the trial court stated to the attorneys for defendant that, if they would lay the proper foundation, the testimony offered would be received.

The abstract presented by the defendant is unsatisfactory. Owing to the gravity of the case, we have read the transcript of the evidence with great care. Dr. Gershom Hill, an alienist, was called as a witness for defendant. In answer to a hypothetical question, he gave it as his opinion that defendant was insane. In answer to a hypothetical question propounded to him by counsel for the State, containing the State's version of the facts, and more fully setting out the facts of the commission of the crime, the witness gave his opinion that the defendant was sane. Dr. Max Witte, an alienist, was produced as a witness by the State, and in answer to the same hypothetical question propounded by defendant's counsel to Dr. Hill, gave his opinion that the defendant was sane.

Testimony was introduced by defendant to the effect, in substance, that defendant had fits when he was a boy, and was dull in his studies at school; that he enjoyed fairly good health when he grew to manhood; that, before he entered the army, he was of good spirits, lively, and cheerful; that, after he came out of the army, his conduct and bearing materially changed; that he was inclined to be melancholy, and took little notice of what was going on about him, and did not perform his work as well as he did before; that he had some affliction in his face, concerning which the record is not clear; that his mouth was twisted to one side for a time, and that this also affected his eyes; that such affliction had practically disappeared. Witnesses testified that defendant told them that he saw persons and things which witnesses said did not exist. No witness gave testimony on which to base an opinion that defendant was insane at the time of the commission of the crime. Witnesses for the State, who had known him several years before he entered the army and after he came out, gave opinions that defendant

was sane. These witnesses, although not required to relate the facts on which to base their opinions, did detail in evidence at some length the conduct of defendant, what he said and what he did, over a period of years.

The motive for the assault is not obscure. It clearly appears that it was robbery.

We reach the conclusion that there is no prejudicial error to defendant shown in the record. We think that defendant was accorded a fair trial. He was earnestly and ably defended. Besides the attorney appointed by the court to defend him, he had the valuable services of Mr. Woodson, probably the best negro lawyer in this state.

We find no reason to disturb the verdict and judgment. The case is—*Affirmed.*

PRESTON, C. J., EVANS and DE GRAFF, JJ., concur.

SUPPLEMENTAL OPINION.

PER CURIAM.—A petition for rehearing has been filed herein and duly considered. Appellant's counsel contend that, since the trial of the case, additional testimony has been procured in behalf of appellant, tending to show that he is defective mentally. Newly discovered evidence is not a ground for a new trial in a criminal case, and in any event cannot be considered when first presented in this court. Upon the record, there was no error in rejecting testimony as to the appellant's mental condition upon the trial. We can review only errors of law, and our pronouncement in the original opinion must be adhered to. The question of the mental condition of the appellant, including any and all evidence now available to him, is proper for consideration by the pardoning power, and outside the province of this court. It will no doubt receive due consideration if presented to the proper authority. The petition for rehearing must be overruled.