PEOPLE *v.* MEERT.

1. CRIMINAL LAW—EVIDENCE—REPUTATION.
   Although the reputation of the complaining witness for peaceful conduct is not directly attacked, in a prosecution for assault with intent to kill and murder, evidence of his reputation therefor is admissible to rebut the claim that respondent had heard the complaining witness was a dangerous man and respondent was afraid of him.

2. SAME.
   An ambiguous answer is properly received in evidence, on the subject of reputation, as against a motion to strike out, when the witness is unacquainted with English, is examined by an interpreter, and defendant's attorney fails to cross-examine as to his meaning pursuant to a suggestion of the trial court.

3. SAME—CONCLUSION—APPEARANCE.
   An answer of respondent's witness, in response to the question how he looked and acted, that the complaining witness was not very well pleased and was angry, is incompetent.

4. TRIAL—CONDUCT OF PROSECUTING ATTORNEY.
   Remarks of the prosecuting attorney that a witness betrayed an animus against the complaining witness, made in the presence of the jury, on a motion to strike out a conclusion of the witness, were not prejudicial error.

5. CRIMINAL LAW—SELF-DEFENSE.
   The respondent was not entitled to have the jury instructed that if respondent, under all the circumstances to which he testified, honestly believed that he was in jeopardy and his act was necessary, he was not guilty; but a charge that if he shot the complaining witness to save his life, or to save himself from great bodily harm, he is not guilty, is sufficiently favorable.

6. WEIGHT OF EVIDENCE—NEW TRIAL.
   The respondent is held to be guilty, by the clear weight of evidence, and his conviction affirmed.

Exceptions before judgment from the recorder's court of Detroit; Phelan, J. Submitted April 29, 1909. (Docket No. 115.) Decided May 26, 1909.

Gustave Meert was convicted of an assault with intent to kill. Affirmed.

*John H. Dohrman,* for appellant.

*Philip T. Van Zile,* Prosecuting Attorney, and *Fred H. Aldrich,* Assistant Prosecuting Attorney, for the people.

BROOKE, J. On the evening of December 31, 1907, the respondent, a Belgian by birth, who had lived in the United States since about the year 1903, committed an assault upon one Van Houtten in Tack's saloon in the city of Detroit. The respondent in making said assault used a revolver, shooting Van Houtten in the left temple, through both eyes and through the roof of the nose. The bullet was cut out from the orbit of the right eye, and the sight of Van Houtten permanently destroyed. Respondent was charged with assault with intent to kill and murder. Respondent's plea was not guilty. He admitted making the assault substantially as testified to by the witnesses for the people, but claimed that he acted in self-defense therein. After conviction and before sentence, the case was removed to this court upon exceptions from the recorder's court of the city of Detroit. It seems that the complaining witness, Van Houtten, was the keeper of a boarding house, where several of his fellow countrymen, among them the respondent, boarded. The respondent had lived with the complaining witness for about a year, but had been requested to leave some weeks before the night of the assault. There is some testimony in the record tending to show that Van Houtten disliked the respondent, and perhaps was jealous of him. There is testimony likewise tending to show that Van Houtten, the complaining witness, had purchased a revolver eight or nine weeks prior to the evening of the assault. His explanation of the reason why he bought the revolver, which he said he purchased before Meert left his house, was that several people had been assaulted and robbed in Franklin

street; that he was in business, had money belonging to other people in his possession, and he was afraid he would be robbed; that he was carrying the money of these people for whom he was buying tickets to go to the old country; that he sometimes had from $140 to $150 at one time. It was claimed by the respondent that on the night of the 28th of December, three nights before the assault was made, the complaining witness had chased him on Jefferson avenue for several blocks with the intention, as he believed, of attempting to take his life. He claims to have been advised that Van Houtten told his (Van Houtten's) wife that he intended to shoot him (Meert). Van Houtten denied the making of the threats. On the night in question, Meert arrived at Tack's saloon in advance of Van Houtten. Van Houtten came in with his wife and one or two companions; his wife making her way to the kitchen in the rear of the saloon, and Van Houtten and his friends taking position at the end of the bar nearest the door. The respondent was standing at the other end of the bar six to eight feet away. Van Houtten ordered a drink, and testifies that he was in the act of paying for it, when, without provocation, respondent made the assault upon him.

The respondent's testimony, upon cross-examination touching the assault, is, in effect, as follows:

" I bought that revolver four years ago in Cincinnati. I never carried the revolver in Detroit, but I stuck it in my pocket the night when I shot him, after supper, because that I thought that he would not come down there, and that I was scared of him. I was expecting that he would come down there that night. I put the revolver in my pocket to be ready for him. Yes, sir; I loaded it with bullets. I left my house about a little after 9 that night, something like that. I first saw him in Tack's saloon. That is the first time I saw him that night. That is the only time, I am sure of that. When he came in there he walked up to the bar, I did not see his wife. Heyman was with him, and Julius De Busschere was with him; in fact, I do not know who Julius De Busschere is. There were other people. Men and women were coming in and

going out right along. I don't know whether Mrs. Herman came in with Van Houtten or not. I saw him just as he came in the door, and I believe that he saw me. He stopped first in front of the doorway before he went to the bar and ordered some drink. He did not say a word to me when he was standing at the bar. There are three doors in the barroom—one goes out to the street, the other into the kitchen, and the third goes into the toilet, out to the toilet. I was about six or eight feet away from him. I then began to get nervous, so that my feet began to shake and my hands to tremble. I was afraid something was going to happen to me. I could have gotten out of there, but do you think I am going to turn around when a man stays there to shoot me; that I know he would so sure as I am setting in this chair; that I am going to turn around and let him shoot? Do you think I am going to do that? I was standing there facing him about four or five minutes. I could not have time to get out of there. I was too scared to move or to turn away from him that he would shoot me when I turned around. I was not looking for trouble. I never looked for trouble in my life. I was not going to settle him that night, and end our differences. I did want to get away from him. Didn't I leave my house for him? I did not back up because I was scared of him, I did not move. I got scared that he was going to shoot. Up at Van Hollebeck's three nights before he was not watching me so particular, and I got more chance there to get away, because he was not near me. When he came into the saloon later on, I was able to get away from him. I could not get away from him at Tack's because I saw that he was not going to give me a chance to get away. I began to read his face. I have read people's faces before. I can remember a good many kinds of men, what they are when I see their faces. I can tell by their faces whether they are going to shoot me or not. That is the reason I got scared of him. I was scared that he was going to shoot me right down. I had the nerve and ability to walk up to him and to grab him, grab hold of him, because I saw he was going to shoot me down, that he grabbing for his gun. When a man is going to shoot you down, you have to do something. I could go forward because I got more strength, because I saw he was going to shoot me. I had to do something because I was up against my life. I was sure that he had a revolver in his

pocket because that man was willing to shoot me on the 28th day of December. No; he did not shoot at me on that day because a policeman was too near. If he did not have the gun in his pocket, he did not have to run from the policeman any more than I did. I think there were more than 15 people in Tack's saloon on the 31st. He was going to shoot me then because he missed me the first time, and he was not going to give me the same chance to run away again. I believe he was going to shoot me on the 31st because he missed me on the 28th. I was not willing to shoot him. I am not willing to shoot nobody, but I want to save my own life. That is what I shot at him for. When I shot, he was going to shoot me, and that I was sure of. It was not only the first time. It was the second time. I never grabbed him by the neck. I grabbed him by the coat, pointed my revolver up to his head when he made a move to strike me. I came up six or eight feet for him. I grabbed him by the coat that night, before he did anything. He was making motions. Did you think that I did not see what he was going to do; after he came in he had a drink, after he came in he was watching me, and after when he had the drink, staying on the bar, with his elbows on the bar, that he watching me? Not only because he looked at me, but he followed me out too. Yes; I did walk up to him this distance, and grab him by the coat, and pulled my revolver, and shot him."

On direct examination the respondent testified:

"He slips his right elbow from the side of the bar, and grabbed for his gun, and I jumped up to him, grabbed him on the heart, and asked him: 'You going to shoot again will you?' 'Yes,' he says, 'I fix you right now.' And I shot him."

Witnesses who were present, with practical unanimity, state that Van Houtten made no threat by word or action against the respondent prior to or during the assault.

The first assignment of error we notice is that the circuit judge erred in permitting the witness Phil Tack to give testimony, upon rebuttal, as to the reputation of the complaining witness in the community in which he resided for being a peaceful, law-abiding citizen. The

objection to this testimony is two-fold: First, that the respondent had not attacked his reputation; and, secondly, that the answer is incompetent. With reference to the first objection, it is sufficient to say that the respondent himself had testified, upon his direct examination:

"I was afraid of him because I heard something about his being a dangerous man, and quite a few times I had heard that, the time he is in the United States. I never knew him in the old country, and I heard him say several stories about hitting men in the old country and about fighting."

Touching the second objection, the answer of the witness Tack to the question, "Is his reputation good or bad?" is: "I never heard nothing from him. For me it is good." Counsel for respondent moved to strike this out, upon the ground that it is not legal knowledge of the general reputation.

"The Court: I know, Mr. Collier, but you understand the class of people who have been testifying—they are not familiar with the English language, and you have a right of cross-examination to establish whether or not the opinion that he has of the defendant's reputation is one that comes to him in the legal way.

"Mr. Collier: That is all, your honor. Give me an exception."

The witness was giving his testimony through an interpreter, as, indeed, did nearly all the witnesses. We think that, under the intimation of the court, it was the duty of respondent's counsel, if not satisfied with the form in which the testimony came through the interpreter, to have interrogated the witness in his client's interests. His failure to do so should not now be permitted to prejudice the rights of the people.

Again, it is urged that the court erred because he refused to permit witnesses for the respondent, in answer to the question, "Tell the witness to describe how Mr. Van Houtten looked and how he acted?" to say: "It seemed that he was not very well pleased; that he was

mad, angry." This answer was clearly incompetent, and was properly stricken from the record by the court.

Respondent claims that reversible error was committed by the prosecuting attorney during the examination of Louis Schockart, a witness called for the respondent. The following transpired:

"*Q.* State, witness, how Meert left Verstraete's place, in what manner?

"*A.* He was afraid of Van Houtten, afraid Van Houtten would shoot him.

"*Mr. Hanley:* Now, your honor, I ask that that be stricken out, and the jury cautioned to disregard that, because merely striking it out does not cure the injury.

"*The Court:* Just read the question.

"*Mr. Hanley:* Certainly the witness shows a very strong desire to do more than is necessary in that question.

"*Mr. Dohrman:* Just a moment. I think that is going too far for the prosecution, the comment.

"*Mr. Hanley:* When he so far exceeds the proprieties of the matter, I think it should be commented upon.

"*Mr. Dohrman:* I desire at this time to take exception to the statement of the prosecuting attorney.

"*The Court:* You claim that to be a competent answer?

"*Mr. Collier:* I think it is not responsive. I am trying to say to your honor it is not responsive to it, but he may further state in what manner he left, his actions at that time he left. I do not think it is responsive.

"*The Court:* Mr. Prosecuting Attorney, when the question is asked by the counsel for defendant and before the interpreter asks it, if you object, I will rule.

"*Mr. Hanley:* Your honor, the question is one that can be answered in a proper manner if the witness has any desire to do so. The question itself is not objectionable, but witness shows such an animus.

"*Mr. Dohrman:* I desire to object to such comment again.

"*Mr. Hanley:* Then I think the question ought to be stricken out, and the jury cautioned not to regard it.
* * *

"*Mr. Collier:* I desire, may it please the court, to take an exception to the remarks of the prosecuting attorney,

wherein he says the witness upon the stand is not attempting to answer fairly and honestly, and words to that effect. I submit that the difficulty of translation, that there is not any indication before the jury that this witness is trying to exaggerate or misrepresent the answer unfairly."

We are unable to say that the foregoing constitutes error. It is entirely plain that the answer of the witness was not responsive to the question, and that in stating that Meert was afraid of Van Houtten, afraid that he would shoot him, he was testifying to something of which he could know absolutely nothing. The prosecuting attorney, in moving that the answer be stricken out, could have used language less open to objection, but we do not see how the respondent's rights were prejudiced by his remarks.

We next come to the consideration of the errors assigned upon the charge of the court. Some 17 requests to charge were preferred on behalf of the respondent. They were, so far as proper, governed by the general charge, in effect.

Particular error is assigned upon the refusal of the court to give the 13th request to charge, which is as follows:

"The question is whether the defendant, under all the circumstances to which he testified, honestly believed that he was in danger of his life or great bodily harm, and that it was necessary to do what he did in order to save himself from danger, and, if he so believed and acted, then your verdict must be not guilty."

The trial judge did charge the jury as follows:

"If you believe, from the evidence, that the defendant shot Van Houtten to save his own life, or to save himself from great bodily harm, then he is not guilty."

And after the charge was concluded, counsel for respondent having called his attention to the 13th request, the court says:

"I will call the attention of the jury to the fact that the

defendant had a right to act as the matter presented itself to him."

Under the facts disclosed in this case, we think the respondent's claims were presented to the jury in a light quite as favorable as was just. The 13th request does not state the law under any circumstances. The respondent has not the right to act "under the circumstances to which he testifies," but under the facts as they appear from all the testimony. The belief of the respondent which is the motive for his action must not only be honest, but must be reasonable and referable to the facts surrounding the action. See *People* v. *Farrell*, 137 Mich. 127 (100 N. W. 264); *People* v. *Coughlin*, 67 Mich. 466 (35 N. W. 72). We are of opinion, after a careful examination of the entire record, that the assault committed by the respondent upon the complaining witness was wholly without provocation, and at a time and under circumstances which wholly negative the theory of self-defense upon which the respondent relied. Ready means of escape were at hand if the respondent had desired to escape, and the great weight of testimony is that no danger was to be apprehended from the complaining witness, so far as said danger might be evidenced by word or deed.

It is unnecessary to consider the other errors assigned. The conviction is affirmed.

MONTGOMERY, OSTRANDER, HOOKER, and MOORE, JJ., concurred.