THE STATE OF IOWA v. ALFRED THOMAS, Appellant

HOMICIDE: When Manslaughter—Husband Killing Wife's Para-
1   mour—Present Provocation—Evidence. Evidence is not admissible, in order to reduce a homicide to manslaughter, that a husband killed his wife's paramour while he, the husband, was in a fury of high passion excited and instigated by the illicit relations, unless such offer of evidence is preceded by evidence that the provocation was present, that it was so recent that reason had had no reasonable time to take the place of high passion. If such reasonable time had elapsed beyond all reasonable doubt, then the court should exclude the evidence as a matter of law; if the court is in doubt, the safer course is to admit the evidence under proper instruction to the jury.

HOMICIDE: Self-Defense—Illicit Relations of Deceased with Wife
2   of Accused—Hostile Motive. Under a plea of self-defense, the accused should be permitted to show by a witness that he, the witness, had seen the deceased hugging and caressing the wife of the defendant and had reported such conduct to the defendant, because such evidence tends (a) to establish the existence of a hostile motive in the mind of deceased and (b) to show the apprehension of increased or greater danger on the part of defendant at the time of the fatal encounter.

*Appeal from Polk District Court.*—HON. LAWRENCE DE
GRAFF, Judge.

THURSDAY, MARCH 18, 1915.

THE defendant was convicted of murder in the first degree and appeals.—*Reversed* and *Remanded.*

*H. W. Laton,* for appellant.

*George Cosson,* Attorney General, and *Wiley S. Rankin,* Special Counsel, for the State.

LADD, J.—The accused discharged a revolver into and killed James William Ashley, August 8, 1914. This occurred at the home of deceased's son, H. A. Ashley, whose wife was sister of the wife of defendant. At the time the latter's wife and children were staying at H. A. Ashley's house and had been for three months last past. Mrs. Ashley testified that defendant came to the house and inquired of deceased why he did not let the children come out instead of motioning them back when they started; that deceased denied motioning them back, when defendant pointed his revolver at him and discharged it twice; that she then handed deceased a sabre, which hung in its scabbard on the wall; that he took it, went out, and later was found lying in the back yard. Her son, thirteen years old, testified: "I first saw Thomas right to the door there —I saw him to the front door and granddad inside of the house there. Granddad was inside of the house. He shot granddad when Alfred was outside and Granddad was in the house, in the kitchen door there. Alfred went into the kitchen. Then granddad went into the middle room and Alfred went into the other door, and shot granddad the last time. After he shot this last time he went outdoors and went around the house and went down the hill there and I didn't see him after that. I saw granddad go out of doors after Alfred left. Alfred had already gone. I don't think granddad had anything when he went out of doors. He did not have his sword. He was getting the sword when Alfred started to shoot him the first time. The sword was kept in the other room. Granddad got the sword after the

second shot. Saw my mother hand it to him. Thomas went out of the door about the time granddad got the sword.''

On the other hand, the defendant testified that he went there for his children with the understanding that he could get them, ''and when we went in the house my sister-in-law handed the old man this sabre, I told him, I says, 'don't do that, I didn't come here for trouble,' he says 'I am going to kill you.' ''

Q. ''Did he call you any names in connection with that?''

A. ''Yes, he called me names.''

Q. ''Tell the jury what he said.''

A. ''Well, he called me a son-of-a-bitch, and I tried to get away from him, but could not.''

State asks that that be stricken out as incompetent and a mere conclusion of the witness.

Court: ''State what he did.''

A. ''And he struck at me and struck me the first time I got back just far enough so he cut my pants, and the next time he struck at me for to cut my head off, and of course I shot. I shot in self-defense. The last time I shot gave me a chance to get out of the house. I didn't know whether I had hit him or not and I got out and went home.''

I. Counsel for defendant by various questions propounded to him sought to show (1) that his mind was inflamed at the time because of the improper relations between deceased and his wife and (2) that in consequence thereof, he was irresponsible for his acts. Objections thereto were sustained, the court intimating that if defendant had a grievance, redress elsewhere might be available. The law is well settled that if a man discovers another ravishing or attempting to ravish his wife and kills him, he is justified therein as fully as the wife herself would have been had she killed him. *State*

1. HOMICIDE: when manslaughter: husband killing wife's paramour: present provocation: evidence.

*v. Neville,* 51 N. C. 423; *Staten v. State,* 30 Miss. 619. So, too, the husband may when necessary resort to force in order to take his wife from the possession of another in whose company he finds her if he has reason to believe they have committed immediately before or are about to commit adultery. *State v. Craton,* 28 N. C. (6 Ire. L.) 164; Wharton's Crim. Ev. Sec. 933. If the husband discovers another in the act of adultery with his wife, he is not entirely justified in taking his life, but the offense is thereby reduced to manslaughter. Says Mr. Bishop in 2 Bish. Crim. L. Sec. 708: "If a husband finds his wife committing adultery, and provoked by the wrong, instantly takes her life or the adulterer's . . . the homicide is only manslaughter. But if on merely hearing of the outrage he pursues and kills the offender, he commits murder. The distinction rests on the greater tendency of seeing the passing fact, than of hearing of it when accomplished, to stir the passions; and if a husband is not actually witnessing the wife's adultery, but knows it is transpiring, and in an over-powering passion, no time for cooling having elapsed, he kills the wrong-doer, the offense is reduced to manslaughter." See note to *Price v. State,* 51 Am. R. 322. The distinction between a case where the husband kills a person ravishing his wife and committing adultery is that the former offense is perpetrated by force, against which he may resort to force in protecting his wife the same as she might have done, while the latter is by her consent, and the offense is reduced to manslaughter, not to shield the wife, but owing to the provocation and passion engendered thereby in the husband. After sufficient time elapses to allow the blood to cool, the circumstance may not be shown in defense, for the law will not permit the wronged husband to take the law into his own hands and wreak vengeance on his wife's paramour. Wharton on Homicide, Sec. 188; *State v. Bone,* 114 Iowa 537; *State v. Hockett,* 70 Iowa 442.

Homicide is extenuated to manslaughter, not by the fact that it was perpetrated in a fury of high passion, but by such

fury being excited by present provocation, which the law deems sufficient for the time to deprive men in general of that power of reason and reflection which ought to lead them to appeal for redress to the law, which provocation prompts them to take the law into their own hands. *Maher v. People,* 10 Mich. 212 (81 Am. D. 781); *State v. John,* 5 Jones (N. C.), 163 (49 Am. D. 396). See 21 Cyc. 751 et seq. and citations. *Shufflin v. People,* 62 N. Y. 229 (20 Am. R. 483).

Says Foster in his Crown Law, page 296: "A husband finding a man in the act of adultery with his wife and in the first transport of passion killeth him; this is not more than manslaughter. But had he killed the adulterer deliberately and upon revenge, after the fact and sufficient cooling time, it had been undoubtedly murder. For let it be observed that in all possible cases, deliberate homicide upon a principle of revenge, is murder." Where the want of provocation is so clear as to admit of no reasonable doubt that the alleged provocation could not have had any tendency to produce such state of mind in ordinary men, the evidence thereof should be excluded; but if there be a reasonable doubt as to whether the alleged provocation had such tendency, it is the safer rule to let the issue go to the jury under proper instructions. Of course, the reasonableness or adequacy of the provocation must depend on the facts of each particular case. In some cases, the courts declare that only actual personal knowledge of the wife's infidelity will extenuate the crime of killing by the husband to manslaughter. See *State v. Neville, supra.* But others with better reason hold that information of the recent liaison of the wife with a paramour, reaching the husband for the first time, may be shown as likely to have thrown him into ungovernable passion. See *Maher v. People,* 10 Michigan 212 (81 Am. D. 781). The circumstances of each case necessarily must determine the admissibility of the evidence as well as its bearing on the different issues presented. Again, it is to be remarked that there is no definite time within which the passions when aroused by such a wrong may be said to have

so far subsided and reason to have resumed its sway to such an extent as that thereafter the killing may be denounced as in vengeance alone. The question is one of reasonable time and dependent on all the facts of the case. While the time may be so long as to exclude all doubt on the subject and exact the exclusion of the evidence in so far as offered in extenuation, more frequently it should be submitted to the jury under proper instructions. *Maher v. People, supra.* The contention then of counsel for defendant that the latter had the right to kill deceased if unduly intimate with his wife is without foundation, and in order to show that defendant was in a condition such that the killing would be manslaughter only, the evidence must be such as to bring it within the rules suggested. Until that had been done and a sufficient provocation shown, it was not material whether defendant's mind were inflamed or the influence exerted thereon.

2. HOMICIDE: self-defense: illicit relations of deceased with wife of accused: hostile motive.

II. Frank Ashley was called as a witness and after saying that he was a son of deceased and acquainted with defendant was asked:

Q. "You may state to the jury whether you ever reported any misconduct that you saw to the defendant, Alfred Thomas, between your father and his wife?"

Objected to as incompetent, immaterial to any issue in this case.

Sustained.

Q. "You may state to the jury whether or not you ever saw your father caressing and hugging this man's wife and reported the same to the defendant."

Objected to as incompetent, irrelevant, immaterial to any issue in this case.

Sustained.

The rulings were erroneous. The evidence in behalf of the state made out a prima-facie case of unprovoked murder. To meet this a plea of self-defense was interposed, in support

of which defendant had testified that deceased, after applying to him opprobrious epithets, assailed him with a sword and that he discharged his revolver to save his own life.

This evidence tendered tended to establish the existence of a hostile motive in the mind of deceased and to show the apprehension of increased or greater danger in that of appellant. Without such evidence, the jury could not know as the defendant did the attitude of deceased's mind toward him nor would they be in a situation to view the acts of deceased from his viewpoint. Such testimony would have thrown light upon the motive or purpose actuating deceased in what he said or did and also upon the conduct of the defendant upon the occasion and the motive which actuated him in killing the deceased. The phase of the evidence adduced by defendant having presented a case of self-defense, it was competent for him to go farther and with this as a predicate, strengthen it by showing that deceased by his own previous conduct, whatever that might have been, if it had such tendency, not only evidenced an evil purpose toward defendant, but that defendant was aware of this, and was likely in their relations one with the other to have that in mind when dealing with him. The principle hardly requires precedent for its support, but in *Gafford v. State*, 122 Ala. 54, the precise question arose. There the deceased had been unduly intimate with the defendant's sister and in reversing the ruling by which evidence thereof and of defendant's information was excluded, the court said that if improper relations between defendant's sister and deceased then existed and "had existed for a considerable length of time previously, it may well be that the jury from their knowledge of human nature, and the history of like cases, might, in the light of such testimony, have inferred a motive on deceased's part to remove a dangerous obstacle out of the way of his illicit enjoyment. However that may be, such testimony would have shown the cause of the enmity of the deceased towards the defendant, its intensity, and would have tended to show a reasonableness of defendant's apprehension of danger of death

or serious bodily harm from the attack made upon him by deceased if the jury should believe that such an attack was made. We are at all events persuaded that with the testimony referred to before them, the jury would have been enabled to balance more justly the substantial merits of the question of self-defense by reason of a fuller and juster apprehension of the defendant's real position at the critical moment of the fatal encounter, and the real state of feeling then existing on the part of each. It is proper, however, for us to observe, that with this testimony in, it would, nevertheless, still be the duty of the jury to inquire whether or not, in view of the provocation, and the state of feeling between the parties, and other attending circumstances, the words or conduct of deceased at the time of the *rencontre* were seized upon by defendant as a pretext to execute a previously formed design to take the life of deceased.''

Such evidence may also disclose a motive on the part of the accused, but this does not justify its exclusion. It is for the jury to determine the weight which shall be accorded it in passing on the different phases of the case on which it has any bearing. See *State v. Shelton,* 64 Iowa 333. The court erred in sustaining objections to the questions propounded.—*Reversed* and *Remanded.*

DEEMER, C. J., GAYNOR and SALINGER, JJ., concur.