STATE OF IOWA, appellee, v. ROBERT CUNNINGHAM RUTLEDGE, JR., indicted as ROBERT C. RUTLEDGE, appellant.

No. 47601.

(Reported in 47 N.W.2d 251 and 50 N.W.2d 801)

[Page content redacted]

April 4, 1951.

Opinion Denying Rehearing January 8, 1952, which follows on page 201.

R. S. Milner, of Cedar Rapids, and Miller, Davis, Hise & Howland, of Des Moines, for appellant.

Robert L. Larson, Attorney General, Don Hise, Assistant Attorney General, Wm. W. Crissman, County Attorney, and D. M. Elderkin, Assistant County Attorney, for appellee.

Oliver, J.—December 15, 1948, at 7:30 a.m. the body of Byron Hattman, of St. Louis, Missouri, was discovered on the floor of room 729, occupied by him in the Roosevelt Hotel, Cedar Rapids, Iowa. The corpse was lying on its chest, just inside the

entryway and partly alongside the bed, the feet were crossed and the arms were pulled up behind the body and crossed on its back. The body was lying partially on a topcoat. The right sleeve of the suit coat was off the arm and shoulder and was turned inside out. There were a number of bloodstains in the public hallway near the door entering the room and inside the room. Apparently the dead man had been beaten over the head. Blood from head wounds had left a large stain in the carpet under his face. Under the edge of the bed was a hotel room key. Hattman's empty billfold lay ostentatiously beside the body. The window shade was drawn and the room unlighted.

A post-mortem performed by Dr. Weland disclosed several head and scalp lacerations and a knife wound in the breast, and also some superficial injuries and small cuts. In his opinion the head wounds were made by a flat or rounded instrument, and one of them in particular might well have caused unconsciousness. He testified death was caused by the stab wound in the chest which was six inches deep, about seven eighths of an inch wide for its entire length and went from left to right at an angle of about 45 degrees through the skin, the chest wall, the sac covering the heart, the right edge of the heart, the diaphragm, and into the upper surface of the right side of the liver about an inch and one half. The wound was clean cut and even and there was no tearing of tissues. In his opinion it was made by a blade at least five inches long, which was very sharp or was driven with considerable force; decedent's body was not moving at the time he was stabbed, the wound was not self-inflicted, it would cause death in from two to five minutes and loss of consciousness in one to two minutes. Dr. Weland expressed the opinion decedent's arms and hands were either held crossed behind his back after the fatal wound or placed there after he died.

December 17, at 2 a.m., officers went to the apartment of Dr. Robert C. Rutledge, Jr., in St. Louis, Missouri, to question him about the death of Hattman. When he heard them knocking at the door he attempted suicide by poison. Later he was indicted and tried for the murder of Hattman, and was convicted of murder in the second degree. Hence this appeal.

I. Defendant complains the evidence was insufficient to

support the verdict of guilty of murder in the second degree. In considering this question the record will be viewed in the light most favorable to the State. A jury finds the facts based upon all the evidence, and its conclusion is binding upon the court unless it is without substantial support in the evidence. However, upon appeal it is necessary to refer only to the evidence which tends to support the verdict. State v. Kneedy, 232 Iowa 21, 27, 3 N.W.2d 611; State v. Rosenberg, 238 Iowa 621, 629, 27 N.W.2d 904.

Dr. Rutledge was an assistant resident physician in a St. Louis hospital. Hattman was an instrument designer for Emerson Electric Company, of St. Louis, at a salary of $462 per month. Mrs. Rutledge was a mathematician and draftsman. Hattman and she worked in the same large room with many others. They first became attracted to each other on a boat ride given a group of company employees July 23, 1948. Sunday, July 25, Hattman took Mrs. Rutledge on a private sailing expedition which included lunch and beer and lasted twelve hours. July 29 he drove her home from their work and stopped a short time on the road for refreshments. July 31 they again went sailing, leaving about 11:30 a.m. and returning at 8 p.m. At 9 p.m. he took her to dinner. She testified she became ill from drinking too much liquor; they returned to her apartment, he had sexual intercourse with her forcibly and against her will. Witnesses testified she was asked later if Hattman had forcibly had sexual relations with her and answered, "No, I guess I was as much to blame as he was. * * * We had too many drinks after sailing and wound up at my apartment." Although she testified she spurned Hattman's approaches after July 31, fellow employees testified that until about August 10 or 11 she went to his drafting board and visited with him several times each day to such an extent as to attract much attention. Her supervisor testified she was an adult and he said nothing about it, "It simply appeared to me that it was strange that a presumably happily married woman would be soliciting attention from an unmarried man."

Dr. Rutledge testified he heard of her affair with Hattman August 10, questioned her and she told him the details. Both Rutledges testified they were so affected they stayed up all night,

and that Mrs. Rutledge did not go to work the next day. Her supervisor testified Mrs. Rutledge was at work the whole day of August 11. She was not seen at Hattman's drafting board after that time.

About August 20 Hattman retained a lawyer with reference to Dr. Rutledge. The lawyer testified Dr. Rutledge telephoned him Mrs. Rutledge was pregnant, this had been definitely established by medical tests, Hattman had had sexual relations with her, Rutledge had not for several weeks because they had been quarreling, he felt Hattman was the father of the unborn child, he did not want any child that was not his, an abortion would cost $250. The attorney told Rutledge he had no right to $250 and he would so advise Hattman.

Rutledge denied the conversation. However, officer Condon testified Rutledge admitted he had telephoned Hattman and asked him for $200 for an abortion and Hattman had referred Rutledge to Hattman's attorney, who told Rutledge he had no legal rights in the matter. Rutledge himself testified he told Hattman over the telephone, "* * * I think I have pretty good reason to believe my wife is pregnant and if she is you are going to be responsible * * *." He testified also the concern of his wife and himself over her possible pregnancy "terminated the latter part of August. It was never brought up between Hattman and me after that."

The Rutledges testified Hattman made many telephone calls to them in which he threatened them, called them vile names and suggested that each separate from the other, etc. However, there was reliable evidence telephone calls were frequently made during August by Dr. Rutledge to Hattman at the place where Hattman roomed until Hattman told him over the telephone not to call any more and to see Hattman's attorney.

Beginning with November, Hattman had spent the first three days of each week at Cedar Rapids working with engineers of Collins Radio Company upon a project in which Emerson Radio Company was interested. The record indicates Rutledge knew this and knew Hattman worked with Mr. Ebershoff, of Cedar Rapids.

Dr. Rutledge testified—Hattman telephoned them demanding money to refrain from telephoning them—he demanded

$2000 and Dr. Rutledge told him it was blackmail but he would "get together as much money as I can" and would give it to him if he would assure Rutledge he would leave St. Louis—Hattman agreed to that—however, they could not agree on any place in St. Louis where they could meet "so I could give him the money", and agreed upon Cedar Rapids. They were not personally acquainted with each other but Mrs. Rutledge had pointed out Hattman to Dr. Rutledge. Dr. Rutledge testified he drove from St. Louis to Cedar Rapids December 1, his only purpose being to settle with Hattman; he saw Hattman in the lobby of the Montrose Hotel but returned to St. Louis without speaking to him because he thought Hattman looked as though he might not be sober. He testified he again drove to Cedar Rapids December 5, was unable to locate Hattman December 6 (that week Hattman remained in St. Louis), telephoned Mrs. Ebershoff on the pretext he wanted to see her husband, learned he was in St. Louis, reasoned Hattman was with him, left Cedar Rapids late that night and returned to St. Louis. He testified he again drove to Cedar Rapids December 13. The next afternoon he entered Hattman's room in his absence and remained there four hours awaiting Hattman. Shortly after Hattman's return Dr. Rutledge departed and immediately drove to St. Louis, leaving Hattman's body lying on the floor of the room.

Dr. Rutledge claimed each trip he made to Cedar Rapids was prearranged with Hattman over the telephone. Witnesses for the State testified that in the story Rutledge first told them he made no claim Hattman knew of his trips and merely said "he heard Hattman made frequent trips to Cedar Rapids."

Dr. Rutledge's vacation began December 1. On that day he started to look for Hattman in Cedar Rapids. During the next two weeks he spent more than half his time in this search, which ended December 14. It does not appear Dr. Rutledge on any of these trips had with him the money he testified he had agreed to "get together" to pay Hattman. He traveled with no luggage except a small bag which looked like a brief case. An employee of the Montrose Hotel, Cedar Rapids, testified he checked Rutledge's room for baggage December 6, and found only a hat and an object a foot long like a piece of pipe or stick with something like adhesive tape or cloth wrapped around one end of it.

On his third trip Dr. Rutledge located Hattman's room, which was 729 in Roosevelt Hotel. Rutledge checked out of the Montrose Hotel at 10:10 a.m., December 14. That morning he had work done on his automobile, amounting to $15.31. He secured credit, telling the office manager he was in Cedar Rapids on a baby case and had only about $12 cash on his person. About 1:45 p.m. Rutledge casually entered and took possession of Hattman's room in Roosevelt Hotel while the maid was cleaning it. When she left he was sitting in a chair. She testified she checked the room about three o'clock, found the door unlocked, opened it a few inches, saw the light was not bright and assumed the shade was drawn and the man was resting and that she closed the door without further investigation.

Hattman worked all day at the Collins plant. He left there about 4:45 p.m. Between 5 and 6 p.m. he left his car at the garage where it was stored. Aside from Dr. Rutledge the garage operator is the last person known to have seen Hattman alive. The occupant of a room across the hall from 729 testified he heard a scuffle at 5:45 p.m., "there were a couple of loud bangs and a general scuffling that sounded like someone wrestling; it sounded like it was coming from the hall north of where my room was. I heard only the words, 'stop, you are killing me'. That was the end of the scuffle." He opened his door, stepped into the hallway, looked in both directions, saw nothing and returned to his room.

The occupant of room 629 testified he heard a sudden spurt of scuffling and fighting from above which lasted just a few seconds, there were several very loud thuds and scuffling around for a brief time and then it subsided. For a short time after that he heard a moaning sound.

Police officers testified that when first interrogated Dr. Rutledge stated he entered Hattman's room, removed his topcoat and suit coat and sat there until dark, at which time he turned on the lights and lowered the shades; later Hattman entered the room and said, "What are you doing here?", Rutledge said he came to talk about his wife and offered him money; Hattman showed Dr. Rutledge his billfold and said, "I don't need your money, I have plenty of money"—this enraged Dr. Rutledge and he struck Hattman and knocked him down, scattering the money

in the billfold on the floor—when Hattman arose he had a black-handled knife in his hand and lunged toward Dr. Rutledge who got a judo hold on Hattman and threw him over his shoulder, at the same time wresting the knife from Hattman; Dr. Rutledge held the knife in front of himself, jabbing at Hattman to keep him back—Hattman threw a suitcase at him and tried to hit him with a chair; they got into the hallway where Hattman had Rutledge down and Hattman had the knife in his hand, Rutledge was able to roll Hattman over, the knife dropped to the floor in the hallway, they got on their feet and Rutledge pushed Hattman back into the room where he struck Hattman and knocked him out—Rutledge, who had been struck and kicked in the eye and nose then washed the blood from his face, picked up his own and Hattman's glasses and the money from Hattman's billfold, put on his coat and topcoat, locked the door, took the key, picked up the knife in the hallway and drove to St. Louis—he threw away the money, knife, glasses and key en route, he did not remember where.

The story told by Dr. Rutledge at the trial is at variance with his earlier statements. He testified that when Hattman entered his room he said to Rutledge, "Oh, you are here"—Rutledge offered him $50—Hattman started to put it in his wallet, became enraged, threw the money on the floor and with his fist struck Dr. Rutledge who sought to escape but was unable to do so—"I fought back; we just fought all over the place, we bounced into the dresser and onto the bed and into the doorway; we were both on the floor and up again, trampling all over the place" —Hattman knocked Rutledge down and kicked him in the face—Hattman had a knife in his hand—threatened to kill Rutledge—Rutledge believed he would do so—they wrestled for it, "we just banged all over the room"—Rutledge secured the knife, said he was getting out and escaped to the hall where Hattman pursued and caught him—they struggled—Hattman pulled Rutledge back into the room—Rutledge dropped the knife—Hattman picked it up—Rutledge was holding him from behind—finally Hattman started to fall forward—Rutledge held Hattman's hands behind his back, saw the knife on the floor—picked it up by the blade, struck Hattman on the head with it, folded down the blade and put the knife in his pocket, he thought Hattman

was stunned—Rutledge held Hattman's hands behind his back for some time, then arose, washed the blood from his face, picked up his glasses and money, put on his coat, hat and topcoat, departed without examining Hattman and started for St. Louis—en route (he did not remember where) he bought some milk and chocolate bars and when he paid for them he found in his pockets Hattman's glasses, the knife "and a lot of money"—he knew it was more than he had when he started to Cedar Rapids—"so, when I got back into the car, back out on the highway, I separated my money and took what I thought was mine, and just threw the glasses and the knife and the money—just threw them out of the window and drove back to St. Louis."

Photographs taken before the body or room was disturbed do not tend to support the story of Dr. Rutledge of a terrific fight all over the room. They show marks at and near the entrance and a few wrinkles in the bedspread, but the furniture and drapes in the main part of the room appear to be in order. Upon his return to St. Louis Dr. Rutledge had his shirt burned because of the blood on it. The office manager of the motor company in Cedar Rapids testified she received a long-distance call from Dr. Rutledge at 9 a.m. December 15, in which he stated he was mailing a check to pay his bill and that he had arrived in St. Louis about 7:30 the evening before. Had that been true he could not have been in Cedar Rapids when Hattman was killed and it would have proved an alibi.

The State contends Rutledge's story was fabricated; that the only demand for money was in August by Dr. Rutledge from Hattman for an abortion; that Dr. Rutledge trailed Hattman for the purpose of attacking him; that he entered Hattman's room without Hattman's consent or knowledge and there waited, armed with a knife with a blade at least five inches in length and with the pipe or club seen in Rutledge's room in the Montrose Hotel, and as Hattman entered the room struck him on the head with the club; that Hattman was not immediately disabled and retreated into the hallway; Dr. Rutledge followed and struck Hattman another blow or blows on the head, rendering him unconscious; Dr. Rutledge then dragged Hattman back into the room, stabbed him in the chest with the knife with the long blade as he lay there unconscious, turned him over upon his face and

held his hands behind his back until after he died—Dr. Rutledge took the pocketknife and billfold from the dead man, removed the money and placed the billfold beside the body—scratched and gouged the walls and doors near the entrance where the body lay—flicked a few drops of blood on other walls of the room, left the room and immediately fled the state.

That Dr. Rutledge was the only other person present when Hattman received the mortal stab wound is not questioned. He did not testify how Hattman received the wound. We understand one theory of the defense to be there was a struggle during which Hattman was accidentally stabbed by his own knife which he held in his hand at the time. This is contrary to the evidence the blade of Hattman's knife was only two and one-half or three inches long and could not have made the six-inch stab wound, and it was not in accord with the evidence that the wound was not self-inflicted and was made when Hattman's body was not moving. The verdict of the jury shows it did not agree with the theory of the defense and did not believe the vital parts of either the testimony of Dr. Rutledge or his earlier admissions and explanations as recounted by others.

The evidence warranted a finding Dr. Rutledge entered Hattman's room in his absence, and upon Hattman's arrival feloniously assaulted and stabbed him fatally with a knife with a blade at least five inches in length. In homicide cases malice may be presumed from the intentional use of a deadly weapon in a deadly and dangerous manner. State v. Emery, 236 Iowa 60, 17 N.W.2d 854. We hold the evidence was sufficient to support the verdict.

II. Various instructions given the jury refer to the killing of a person in the heat of passion induced by provocation. Instruction 10 states: "By 'provocation' is meant some mitigating facts or circumstances which in law reduce the degree or grade of the alleged criminal act, but which do not go to the extent of absolving the perpetrator from all responsibility for it." Instruction 15 refers to murder in the second degree as a felonious killing done without sufficient provocation to reduce the offense to manslaughter. Instruction 17, after defining manslaughter and stating malice aforethought is an essential ingredient in murder but not in manslaughter, and this is the distinguishing

feature between them, states, among other things, if the killing is committed in the heat of passion induced by reasonable or adequate provocation the crime is manslaughter.

Instruction 16 states "to convict of murder in the second degree" the jury must find, among other propositions, that the killing was with malice aforethought and "without such provocation as would reduce the offense to manslaughter, as hereinafter explained." Instruction 18 states what the jury must find to convict the defendant of manslaughter. It is similar to instruction 16 but omits malice aforethought and omits "without such provocation as would reduce the offense to manslaughter."

 Error is assigned to the omission from instruction 18 of a statement that if the killing was committed in the heat of passion, induced by adequate provocation, the crime of murder would be reduced to manslaughter. Although such a statement might well have been included in this instruction on manslaughter we do not think its omission constitutes reversible error. One reason is that defendant was convicted of murder in the second degree, and the jury did not reach and had no occasion to consider this instruction on the included offense of manslaughter. Hence, the jury could not have been misled by the claimed error in the instructions upon manslaughter. Various decisions hold a verdict of guilty of a higher degree of a crime cures possible errors in instructions upon included offenses. State v. Ebelsheiser, 242 Iowa 49, 59, 43 N.W.2d 706, 712; State v. Stansberry, 182 Iowa 908, 166 N.W. 359; State v. Evenson, 237 Iowa 1214, 1220–1222, 24 N.W.2d 762; State v. Rodriguez, 238 Iowa 18, 22, 25 N.W.2d 732; State v. Neitzel, 155 Iowa 485, 487, 136 N.W. 532; State v. Miller, 124 Iowa 429, 434, 100 N.W. 334; 24 C. J. S., Criminal Law, section 1922p3, pages 1037, 1038; West's Iowa Digest System, Homicide, Key No. 340(4).

 Moreover, this is not a case of the omission of a defense from an instruction. Provocation is not a defense to a manslaughter charge. If the killing in this case was committed in the heat of sudden passion induced by adequate provocation the degree of the homicide would be reduced from murder. The jury was so advised, not only in the instructions on murder and the instructions with reference to provocation, but also in

instruction 17 which explains the difference between murder in the second degree and manslaughter and might be designated a transition instruction from a higher to the next lower charge.

It is well settled all instructions should be construed together, State v. Katz, 241 Iowa 115, 40 N.W.2d 41; State v. Mart, 237 Iowa 181, 187, 20 N.W.2d 63. And where, as here, a statement omitted from an instruction is adequately covered by statements in others and its omission does not mislead the jury or deprive the accused of a defense to which he was entitled, such omission is not reversible error. State v. Harrington, 220 Iowa 1116, 1123, 264 N.W. 24, 28; State v. Billberg, 229 Iowa 1208, 1222, 296 N.W. 396, 403.

III. Defendant contends instructions 15 to 19, inclusive, are inadequate and erroneous with reference to a killing committed in the heat of sudden passion due to provocation produced by acts of the deceased. The principal complaint appears to be based upon statements in instruction 19.

One statement is: "No mere words, however abusive or insulting, can in themselves constitute the adequate provocation referred to herein * * *." This statement announces a correct rule of the law applicable to this case. It was approved in State v. Hockett, 70 Iowa 442, 453, 30 N.W. 742.

The other statement is: "* * * the fact, if it be a fact, that Byron C. Hattman had been criminally intimate with the wife of defendant, could not, under the facts and circumstances shown in this case, of itself constitute such reasonable and adequate provocation."

This statement is not erroneous.

The record shows defendant had knowledge of the claimed intercourse more than four months prior to the killing of Hattman. The rule in such cases is thus stated in State v. Thomas, 172 Iowa 485, 491, 492, 154 N.W. 768, 770: "* * * if sufficient time has elapsed, after the consummated act of ravishment or adultery, so that the blood has time to cool and reason resume its sway, the law will not permit the injured husband to redress the wrong by taking the law into his own hands and wreaking vengeance upon his wife's paramour; and if he does, he is guilty of murder."

See also State v. Thomas, 169 Iowa 591, 151 N.W. 842; State v. Bone, 114 Iowa 537, 87 N.W. 507.

IV. Instruction 25 states the evidence of the illicit relationship and defendant's knowledge thereof may be considered upon the issue of self-defense only. Defendant excepted to this on the ground "it was admissible also on the question of 'heat of passion' and 'adequate provocation'." The question presented is substantially the same as the one last determined. We hold the exception was properly overruled by the trial court.

V. Instruction 7 defines malice with reference to murder in the first or second degree, in part: "Malice means that condition of the mind which prompts one to do a wrongful act intentionally, without legal justification or excuse. It does not mean mere spite, hatred, or ill will, but does signify that state of disposition which shows a heart that is regardless of human life."

Instruction 8 defines malice aforethought. Instruction 16 recites that to convict of murder in the second degree the jury must find each of the propositions of fact therein listed, one of which is that the killing was done with malice aforethought, and if it so finds it will find defendant guilty thereof. Instruction 15 contains a statement: "Malice as applied to murder in the second degree does not necessarily mean spite or hatred although both of these elements may exist; but it means the doing of an act wrong in itself, without good cause or lawful excuse."

Defendant contends this statement is erroneous. A like statement was approved in State v. Decklotts, 19 Iowa 447, 448, 449. Defendant relies upon State v. Baker, 157 Iowa 126, 142, 135 N.W. 1097, 138 N.W. 841, as inferentially holding to the contrary. We need not determine the sufficiency of the statement standing alone.

The definition of malice in instruction 7 appears to be correct and adequate. A similar definition was approved in State v. Burris, 198 Iowa 1156, 1158, 198 N.W. 82, 84, quoted in State v. Emery, 236 Iowa 60, 64, 17 N.W.2d 854. The statement complained of is not contrary to the definition in instruction 7. Apparently it is merely less inclusive. When all of the instructions are considered together, as required by the rule, no error or conflict appears.

VI. Error is predicated upon the refusal of the court to submit to the jury instructions upon any included offense lower than manslaughter. The action of the court was correct. The evidence is conclusive the stab wound was received by Hattman in connection with the struggle with defendant and the wound caused Hattman's death some minutes after it was received. Under such record it would have been improper to instruct the jury upon any crime less than the degrees of criminal homicide. Death having resulted from the wound, defendant was either criminally responsible for the homicide or was entitled to an acquittal. State v. Froelick, 70 Iowa 213, 30 N.W. 487; State v. Sterrett, 80 Iowa 609, 45 N.W. 401; State v. Luther, 150 Iowa 158, 129 N.W. 801; State v. Johnson, 221 Iowa 8, 264 N.W. 596, 267 N.W. 91; State v. Walker, 133 Iowa 489, 498, 110 N.W. 925; State v. Johnston, 221 Iowa 933, 267 N.W. 698; State v. Hessenius, 165 Iowa 415, 146 N.W. 58, L. R. A. 1915A 1078; State v. Woodmansee, 212 Iowa 596, 233 N.W. 725.

Moreover, although the instructions permitted the jury to find defendant guilty of manslaughter the jury found defendant guilty of a higher degree of homicide. Hence, the jury would doubtless not have convicted of any lower offense, had such instructions been given. It follows defendant was not prejudiced by the refusal of the court to instruct upon offenses less than manslaughter. State v. Crutcher, 231 Iowa 418, 421, 1 N.W.2d 195; State v. Smith, 215 Iowa 374, 380, 245 N.W. 309; State v. Troy, 206 Iowa 859, 220 N.W. 95, 221 N.W. 370; State v. Woodmansee, 212 Iowa 596, 616, 233 N.W. 725.

VII. Defendant predicates error upon the instructions on self-defense. Instruction 23 states if defendant was "the aggressor at the time in question and made the first show of force, and thus brought on the conflict and pressed the fight until his adversary was slain, then he cannot claim to have acted in self-defense." Defendant construes the instruction to mean the first show of force *alone* would bar self-defense. The conjunction "and" in the clause "thus brought on the conflict and pressed the fight until his adversary was slain," indicates the statement should be given a contrary construction. This is in accord with instruction 22, which states if defendant was the aggressor but in good faith withdrew from the combat and

abandoned further combat, and so advised Hattman, who thereafter renewed the combat and advanced upon defendant with a knife in his hand and in a threatening attitude and with threatening words, then defendant would have the right of self-defense.

Defendant complains also of the refusal to give his requested instruction 10. This refusal affords no basis for complaint for the reason that instruction 22 given by the court contains the substance and most of the language of the requested instruction.

 VIII. Defendant contends the court did not properly instruct the jury with reference to circumstantial evidence. Several of the errors assigned in this division are based upon the premise there was no direct evidence of the commission of the crime charged or that Dr. Rutledge was guilty thereof. Defendant quotes from Black's Law Dictionary page 328:

"When the existence of any fact is attested by witnesses, as having come under the cognizance of their senses, * * * evidence of that fact is said to be direct or positive. When, on the contrary, the existence of the principal fact is only inferred from one or more circumstances which have been established directly, the evidence is said to be circumstantial."

Substantially the same definition is given in the instructions in the case at bar. However, defendant's premise that all the evidence was circumstantial is incorrect. The testimony of the witnesses who heard the death struggle certainly was direct evidence. Hence, there is no factual basis for several of the assignments of error. We do not determine whether there was direct evidence other than that noted. See State v. Engler, 217 Iowa 138, 251 N.W. 88.

 Other errors are predicated upon the contention that to establish guilt in a criminal case by circumstantial evidence each circumstance essential to the conclusion of defendant's guilt must be fully established in the same manner and to the same extent as if the whole issue rested upon it. State v. Blydenburg, 135 Iowa 264, 278, 112 N.W. 634, 14 Ann. Cas. 443, is cited. The Blydenburg case has been overruled upon this point. State v. Billberg, 229 Iowa 1208, 1221, 296 N.W. 396;

State v. Wilson, 166 Iowa 309, 325, 144 N.W. 47, 53, 147 N.W. 739. Moreover, various decisions in which the evidence was not wholly circumstantial have held contrary to defendant's contention. State v. Ferguson, 222 Iowa 1148, 1153, 1154, 1155, 270 N.W. 874; State v. De Koning, 223 Iowa 951, 274 N.W. 25; State v. Panther, 230 Iowa 1115, 1117, 300 N.W. 291.

IX. In his cross-examination Dr. Rutledge was asked about certain prior statements made by him relative to his connection with Hattman's death, which were inconsistent with parts of his testimony. Dr. Rutledge answered he did not remember having made any such statements. On rebuttal by the State, over defendant's objections, witnesses were permitted to testify Dr. Rutledge made the statements. Defendant complains this testimony should have been presented as a part of the State's evidence in chief.

That it might have been used in chief would not necessarily render it inadmissible on rebuttal. See subsection 6 of section 780.5, Code of Iowa 1950, I. C. A. State v. Graham, 203 Iowa 532, 535, 211 N.W. 244, 245, states:

"It many times occurs that testimony used in rebuttal might have been used by the State as direct testimony in the first instance; yet, if in fact it was not so used, but in reality it does rebut some of the matters testified to by the defendant or his witnesses, it should be classed as rebutting testimony."

See also State v. Burris, 198 Iowa 1156, 1162, 1163, 198 N.W. 82; State v. Crandall, 227 Iowa 311, 319, 320, 288 N.W. 85; State v. Hunter, 118 Iowa 686, 92 N.W. 872; State v. Chingren, 105 Iowa 169, 74 N.W. 946. The record indicates the admission of this evidence in rebuttal was not an abuse of the discretion lodged in the trial court in such matters. State v. Marcus, 240 Iowa 116, 121, 34 N.W.2d 179.

X. Over defendant's objections, witnesses for the State were permitted to testify in rebuttal that deceased Hattman's character as to being a quiet and peaceable citizen was good. The defense asserts it made no attack on Hattman's reputation or character and that the admission of the evidence constituted error. The prosecution contends the evidence for defendant was sufficient to raise the issue.

No Iowa decision in point has been called to our attention, and other authorities are not harmonious. Some hold the prosecution may offer the peaceable character of deceased whenever the issue of self-defense has been raised, without more. Thrawley v. State, 153 Ind. 375, 55 N.E. 95; Ferguson v. State, 138 Tenn. 106, 196 S. W. 140; State v. Holbrook, 98 Or. 43, 188 P. 947, 192 P. 640, 193 P. 434; 1 Wigmore on Evidence, Third Ed., section 63, pages 467, 468. 40 C. J. S., Homicide, pages 1225, 1226, section 272e, states although such evidence cannot be introduced by the prosecution in the first instance, where the accused, in a homicide case in which self-defense has been set up, has introduced evidence tending to show the turbulent, violent and quarrelsome character of the deceased, the prosecution may in rebuttal introduce reputation or character evidence to the contrary. 26 Am. Jur., Homicide, section 349, page 397, states:

"No general rule can be laid down for the determination of what will be held to constitute an attack by the defendant upon the character or reputation of the deceased, so as to open the door for rebuttal evidence; each case must be decided according to the circumstances thereof."

In the case at bar the defense introduced evidence of various telephone calls to defendant over a period of several months in which deceased abused defendant, cursed and vilified him, mumbled and yelled over the telephone, threatened to come over to the hospital and beat defendant; when defendant's detective talked to deceased the latter took a large knife out of his hip pocket, his face was flushed and he made a gesture with the knife, told the detective to warn Dr. Rutledge, stated he (deceased) was not a doctor but could operate, angrily shook the knife at the detective and said, "That goes for you, too"; this was reported to Dr. Rutledge; Hattman was frequently intoxicated; after making his first drive to Cedar Rapids to see Hattman, Dr. Rutledge did not speak to him because Hattman did not appear sober; on December 14 Dr. Rutledge was a little nervous about meeting Hattman because Hattman was quick tempered and had made threats; however, Dr. Rutledge thought it would be safe in broad daylight in a crowded hotel.

Most authorities hold the attack on the character of the deceased need not be direct as to his character or reputation to render admissible in rebuttal evidence of his good character as to being a quiet and peaceable citizen. Whether the attack is made by evidence of general reputation or otherwise the State may meet it by evidence of such good character. We hold the evidence introduced by the defense in this case constituted an attack upon Hattman's character within the rule above-mentioned. Some illustrative decisions are:

People v. Meert, 157 Mich. 93, 121 N.W. 318; Commonwealth v. Castellana, 277 Pa. 117, 121 A. 50; People v. Fitch, 28 Cal. App.2d 31, 81 P.2d 1019, 1024; Davis v. People, 114 Ill. 86, 95, 29 N. E. 192; Ray v. State, 136 Tex. Cr. 246, 124 S.W.2d 119; Butler v. State, 131 Tex. Cr. 543, 100 S.W.2d 707; People v. Gallagher, 75 App. Div. 39, 78 N. Y. S. 5, affirmed 174 N. Y. 505, 66 N.E. 1113; Brock v. State, 55 Okla. Cr. 410, 32 P.2d 88; State v. Todd, 28 N. M. 518, 214 P. 899; State v. Vacos, 40 Utah 169, 120 P. 497.

Hence, the ruling of the trial court was correct.

XI. Complaint is made rebuttal evidence introduced by the State of visits of Mrs. Rutledge to Hattman's drawing board between July 23 and August 10, 1948, injected a collateral issue into the case. Presumably the real issue was what Dr. Rutledge learned of the affair between his wife and Hattman rather than what took place. State v. Boston, 233 Iowa 1249, 1251, 1252, 11 N.W.2d 407. However, the issue complained of was made by defendant upon the direct examination of Mrs. Rutledge. Hence, the orders overruling defendant's objections to evidence tending to rebut this testimony did not constitute error. State v. Mauch, 236 Iowa 217, 227, 17 N.W.2d 536.

XII. In the closing argument the county attorney lay on the floor and his assistant demonstrated in pantomine upon his body how the State claimed Dr. Rutledge stabbed Hattman. Defendant contends this was prejudicial misconduct. The State points to a defense demonstration made by Dr. Rutledge and one of his attorneys while Dr. Rutledge was testifying, showing the position and movements of Dr. Rutledge's hands and arms as he was behind Hattman, struggling with the latter, whose movements in the struggle were performed by the at-

torney. Later the attorney impersonated Dr. Rutledge in the same position and a medical witness for the defense, with a pencil simulating a knife, impersonated Hattman. They struggled and the witness stabbed himself with the pencil, thus demonstrating the theory of the defense as to the manner in which Hattman accidentally stabbed himself.

However, no complaint of the demonstration of the county attorney and his assistant was voiced when that demonstration was made. Apparently the objection was first made in the motion for new trial. It was made too late to be considered. State v. Alberts, 241 Iowa 1000, 43 N.W.2d 703; State v. Banks, 227 Iowa 1208, 1211, 290 N.W. 534; State v. Williams, 238 Iowa 838, 849, 28 N.W. 2d 514.

XIII. The county attorney stated in argument: "* * * that where the financial means for defense are apparently limitless—." An objection by the defense left the statement unfinished. The county attorney contended this argument was in answer to argument of defense counsel. The court stated this was "not in the record" and promptly cautioned the jury to decide the case on the evidence or lack of evidence under the instructions and to permit no remarks of counsel to deter it from that purpose. In overruling this ground of defendant's motion for new trial the court expressed regret it had not admonished counsel more strongly at the time, but stated it was satisfied the statement did not prejudice the jury. We agree with this conclusion. State v. Bell, 235 Iowa 767, 770 et seq., 16 N.W.2d 218; State v. Saltzman, 241 Iowa 1373, 1383, 44 N.W.2d 24, 29.

Having thus disposed of the complaint the trial court found it unnecessary to determine the contention of the prosecution the statement was made in response to arguments for defendant that the State had spent money on the trial of the case "like a drunken sailor", and similar statements. There was no showing the defense had not made such arguments. Under such circumstances it has been held it will be presumed the prosecutor's argument was a legitimate response to the argument for defendant. State v. Johnson, 221 Iowa 8, 19, 20, 264 N.W. 596, 267 N.W. 91.

XIV. One ground of the motion for new trial was that juror Novotny, who had testified on voir dire that he was unprejudiced and impartial, was strongly biased and prejudiced against defendant and prior to the trial had stated to others defendant should be hanged and he would hang him if he had anything to do about it. This was denied by the juror. Affidavits were filed and witnesses examined on both sides.

Among the affidavits for the State were those of the other eleven jurors, stating none of them heard any remarks indicating Novotny was prejudiced against defendant or had any feelings or beliefs as to defendant's guilt or innocence prior to the retirement of the jury for deliberation; the jury deliberated four hours and agreed upon its verdict on the fourth ballot taken; the result of the first ballot showed four for murder in the first degree, seven for murder in the second degree and one for manslaughter; at no time during the deliberations were there any votes for acquittal; at no time did Novotny make any statement to any of the other jurors in an effort to influence the verdict or make any statements urging that the verdict be guilty of murder in the first degree or that defendant should be hanged.

Novotny testified he voted for murder in the second degree on each ballot.

The ruling on defendant's motion for new trial shows the trial court carefully considered the testimony and affidavits on both sides, found Novotny told the truth and that he was an impartial juror. There was a disputed question of fact involved, and the trial court's decision upon conflicting evidence is controlling. State v. Ebelsheiser, 242 Iowa 49, 60, 43 N.W.2d 706, 713, and citations.

XV. Finally defendant contends the sentence to the penitentiary for seventy years is excessive. Although severe, the sentence is less than the maximum fixed by statute. The trial court had the accused and the witnesses before it for some time and was in a better position than is this court to determine what sentence should be imposed. The sentence does not appear excessive and we do not feel this court should interfere with it.

The record indicates defendant had a fair trial. No reversible error appears. Hence, the judgment is affirmed.—Affirmed.

All Justices concur except Mantz, J., not sitting, and Thompson, J., taking no part.